# Illinois Official Reports

## Appellate Court

*In re A.P.*, 2014 IL App (1st) 140327

| | |
|---|---|
| Appellate Court Caption | *In re* A.P., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. A.P., Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-0327 |
| Filed | June 27, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The habitual juvenile offender provision of the Juvenile Court Act was upheld over respondent's contentions that it violates the eighth amendment of the United States Constitution, the proportionate penalties clause of the Illinois Constitution, the United States Supreme Court's decision in *Miller*, and the due process and equal protection clauses, since respondent was sentenced to commitment to the Department of Juvenile Justice as a habitual juvenile offender until his twenty-first birthday, the habitual juvenile offender provision of the Act was held constitutional in *Chrastka*, that decision is binding on the appellate court until revisited, and the same reasoning applies to respondent's claim that the provision violates the due process and equal protection clauses. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-JD-03423; the Hon. Patricia Mendoza, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Heidi Linn Lambros, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Eve Reilly, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Palmer concurred in the judgment and opinion.

# OPINION

¶ 1     After a jury trial, respondent A.P. was adjudicated a delinquent minor for the offense of robbery and sentenced as a habitual juvenile offender and committed to the Department of Juvenile Justice (DJJ) until his twenty-first birthday, as required pursuant to section 5-815(f) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-815(f) (West 2012)). On appeal from that order, respondent contends that: (1) the habitual juvenile offender provision of the Act is unconstitutional under the eighth amendment of the United States Constitution, the proportionate penalties clause of the Illinois Constitution, and the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012); and (2) the habitual juvenile offender provision of the Act violates federal and state due process and the equal protection clauses of the United States and Illinois Constitutions. We affirm.

¶ 2     On August 29, 2012, the State filed a petition for adjudication of wardship for respondent, who was 15 years old at the time. The petition alleged that respondent committed two counts of each of the following: aggravated robbery, robbery, theft from person, aggravated battery, and battery, all based on an incident that occurred on August 28, 2012. Respondent does not challenge the sufficiency of the evidence, so we will discuss the facts only to the extent necessary to understand the current appeal.

¶ 3     At trial, Christian Gomez, who was 19 years old at the time of trial, testified that at approximately 3 p.m. on August 28, 2012, he and his cousin, Jose Soria, were traveling from Soria's house to Gomez's house. Gomez was on a scooter and Soria was on his rollerblades. As they approached the intersection of 59th and Richmond Streets, Gomez noticed two individuals, one he identified as respondent, crossing the street at the intersection and heard someone say, "A." Gomez continued walking with his cousin but saw respondent and the other individual again on Richmond. Gomez stopped and respondent said, "What you is?" Gomez believed respondent was asking what gang Gomez belonged to. Respondent also asked Soria the same question in Spanish. Gomez told respondent that he was not in a gang, and then respondent told Gomez to "Drop the crown." Gomez believed respondent was asking him to drop the rival gang sign and Gomez told respondent he did not know how. Respondent showed

Gomez how to do it. Eventually Gomez did what respondent asked so respondent would leave them alone. At this point, respondent was standing in front of Gomez about two feet away and Gomez noticed that respondent had a tattoo on his arm with "[a] face, a knight going down with the letter A going down." After Soria also threw down the gang sign, respondent and the other individual let Gomez and Soria leave. Gomez and Soria continued west on 59th Street, but only traveled half of a block when respondent and the other individual stopped Gomez and Soria again. Respondent stood in front of Gomez and the other individual stood in front of Soria. Respondent told Gomez and Soria to "[l]ift up [their] shirts" and they did. Gomez was wearing a gold chain with two gold medallions around his neck and respondent "snatched" the chain from Gomez's neck and the other individual grabbed a chain and medallion from Soria's neck. Respondent then was "still looking at [Gomez], but he was going back, *** pretending he had a gun in his back." As respondent continued walking backward, he said, "You do something stupid, I'm going to kill you." Gomez believed respondent had a gun. Gomez watched respondent and the other individual continue north on Richmond Street, and then Gomez and Soria went to Gomez's house.

¶ 4       After speaking to his mother, Gomez called 9-1-1. Gomez then spoke with a police officer in front of his house, told the officer what had happened, and gave the officer a description of respondent, including the tattoo, and of the other individual. The officer left and Gomez remained in front of his house with two other police officers. Eventually, those officers drove Gomez to 59th Street and Francisco Avenue, about a block away from 59th and Richmond Streets, where Gomez saw respondent and the other individual on the sidewalk, with their hands behind their backs. Gomez immediately recognized and identified respondent to the police as the individual that had stolen his chain. Gomez also identified the other individual as responsible for stealing Soria's chain. One of the officers showed Gomez and Soria a medallion which Soria identified as his medallion that had been stolen that day.

¶ 5       Jose Soria, who was 18 years old at the time of trial, substantially corroborated Gomez's testimony. He testified that on August 28, 2012, he was wearing a gold chain with a fake gold medallion that had a picture of the Virgin of Guadalupe on it. As Soria and Gomez approached 59th and Richmond Streets on their way to Gomez's house, Soria noticed "two bad guys" who started "saying things" to Soria and Gomez. Soria identified respondent as one of the individuals he saw. Eventually, respondent stopped Soria and Gomez and asked them to "throw down the crown" and demonstrated how to do it, and Soria complied because he wanted respondent to leave him and Gomez alone. Soria and Gomez then continued on their path until Soria felt respondent's arm around Soria. Respondent told Soria and Gomez to lift up their shirts. Soria lifted up his shirt but said to respondent, "Look, I don't have anything, why are you stopping us if we're nothing, you know we're nothing." Then, respondent took Gomez's chain and the other individual took Soria's chain. Respondent told Soria and Gomez if they did something stupid, he would kill them, and respondent's hand was behind his back, "pretending that he had a gun but we didn't know if he had a gun." Soria was scared that respondent would kill them. Respondent and the other individual then ran away toward 58th and Richmond Streets. Soria and Gomez then went to Gomez's house, and after Gomez called 9-1-1, they went out front to wait for the police. Gomez gave descriptions of the offenders to the first officers that arrived. Those officers left and then a "truck" arrived with two police officers. Soria and Gomez got into the truck and eventually were driven by the officers to 59th and Richmond Streets, where Soria identified respondent and the other individual as the ones

who had stolen the chains from Soria and Gomez. A police officer also showed Soria his chain and medallion that had been stolen.

¶ 6    Officer Sean Donahue testified that at approximately 4 p.m. on August 28, 2012, he and his partner received a dispatch call of robbery while they were on duty and they proceeded to the area of 59th and Richmond Streets. They saw no possible offenders so they then proceeded to 60th Street and Albany Avenue where they spoke with Gomez and Soria, the victims. Donahue discussed the robbery with them and asked Gomez for a description of the offenders. Gomez gave a description of the two offenders, including a description of a tattoo on one offender's lower left arm: an upside-down knight's head. Donahue and his partner then left to search for possible offenders. Near 59th Street and Francisco Avenue, they saw two individuals walking that matched the description from Gomez and Soria, respondent and another individual. As they pulled up to the individuals, Donahue noticed respondent had a tattoo on his lower left arm, the upside-down helmet of a knight in shining armor. Donahue and his partner exited their vehicle and asked respondent and the other individual to approach them. The officers performed a protective pat-down of the suspects and no weapons were found. Gomez and Soria were relocated to 59th Street and Francisco Avenue and identified the two individuals as the offenders that had robbed them. Donahue and his partner then performed custodial searches of respondent and his co-offender. They recovered a medallion with a picture of the Virgin Mary on it from respondent, which was Soria's.

¶ 7    Officer Julian Morgan, Donahue's partner on the afternoon of August 28, 2012, substantially corroborated Donahue's testimony. Morgan also testified that, after the victims positively identified the offenders, he performed the custodial search on respondent and recovered a medallion with a picture of the Virgin Mary on it. He took the medallion over to the victims sitting in the vehicle and Soria identified it as his. Morgan further testified that respondent's tattoo was "[a]bsolutely" a sign of disrespect toward the Ambrose gang because the tattoo was the upside-down knight's helmet and the upside-down letter "A," which was respondent "throwing down the Ambrose symbol." He said the upside-down tattoo was a "bold statement."

¶ 8    The jury found respondent guilty of robbery and not guilty of aggravated robbery.

¶ 9    At the sentencing hearing, the State presented evidence that respondent had been convicted of aggravated battery in 2010 and of burglary in 2011. Certified copies of both adjudications were admitted into evidence. The State asked that respondent be committed to the DJJ until his twenty-first birthday pursuant to the habitual juvenile offender provision of the Act.

¶ 10   In mitigation, the defense presented evidence that, since respondent had been in custody at the juvenile detention center, he had won first and second place in two different poetry competitions, had a 3.9 grade point average in school, had at least one session to remove his tattoos, had no desire to return to his old neighborhood, and had secured residential placement as an alternative to prison. In allocution, respondent stated that no matter what happened at sentencing, he was going to "make something of himself."

¶ 11   The circuit court found respondent was a habitual juvenile offender and sentenced respondent to a mandatory term of commitment to the DJJ until his twenty-first birthday.

¶ 12   On appeal, respondent first contends the habitual juvenile offender provision of the Act violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution because the provision removes the trial court's discretion in sentencing minors who are adjudicated habitual juvenile offenders, primarily

relying on the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012).

¶ 13    Initially, we note our supreme court has determined that the eighth amendment and the proportionate penalties clause do not apply to juvenile proceedings initiated by a petition for an adjudication of wardship. *In re Rodney H.*, 223 Ill. 2d 510, 521 (2006). The court explained that both the eighth amendment and the proportionate penalties clause apply only to the criminal process, "that is, to direct actions by the government to inflict punishment." *Id*. at 518. The court concluded that proceedings under the Act are not criminal in nature, and that an adjudication of wardship is not a direct action by the State to inflict punishment within the meaning of the eighth amendment and proportionate penalties clause. *In re Rodney H.*, 223 Ill. 2d 510, 518, 521 (2006); see also *In re Jonathon C.B.*, 2011 IL 107750, ¶ 95 (noting that, "[r]ecently, this court again reiterated that 'it is undoubtedly true that a delinquency adjudication is still not the legal equivalent of a felony conviction despite the amendments to the Act' ") (citing *In re Lakisha M.*, 227 Ill. 2d 259, 270 (2008)). Nonetheless, even if the eighth amendment and proportionate penalties clause applied to the Act, we conclude that the habitual juvenile offender provision is constitutional.

¶ 14    Whether a statute is constitutional is a question of law and we therefore review it *de novo*. *People v. Sharpe*, 216 Ill. 2d 481, 486-87 (2005). Statutes carry a strong presumption of constitutionality. *Id*. at 487. To overcome this presumption, the party challenging the statute has the burden of establishing that the statute violates the constitution. *Id*. "We generally defer to the legislature in the sentencing arena because the legislature is institutionally better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *Id*. "The legislature's discretion in setting criminal penalties is broad, and courts generally decline to overrule legislative determinations in this area unless the challenged penalty is clearly in excess of the general constitutional limitations on this authority." *Id*.

¶ 15    The eighth amendment, as applied to the states through the fourteenth amendment, prohibits the infliction of cruel and unusual punishment for criminal offenses, as well as punishments that are disproportionate in relation to the offense committed or the status of the offender. U.S. Const., amend. VIII; *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. Our Supreme Court has observed:

> "As we noted the last time we considered life-without-parole sentences imposed on juveniles, '[t]he concept of proportionality is central to the Eighth Amendment.' [Citation.] And we view that concept less through a historical prism than according to ' "the evolving standards of decency that mark the progress of a maturing society." ' [Citation.]" *Id*. at ___, 132 S. Ct. at 2464.

¶ 16    The proportionate penalties clause, or article I, section 11, of the Illinois Constitution, is similar to but not identical with the eighth amendment. Ill. Const. 1970, art. I, § 11; *People v. Clemons*, 2012 IL 107821, ¶ 36. The section provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The second requirement of the clause, that penalties must have the objective of restoring the offender to useful citizenship, was an addition to the 1970 Illinois Constitution. *Clemons*, 2012 IL 107821, ¶ 39. "The convention record indicates that the framers intended, with this additional language, to provide a limitation on penalties beyond those afforded to the eighth amendment." *Id*. However, our supreme court has also stated that there is "no indication that the possibility of rehabilitating an offender was

- 5 -

to be given greater weight and consideration than the seriousness of the offense in determining a proper penalty." *People v. Taylor*, 102 Ill. 2d 201, 206 (1984) (citing *People v. Waud*, 69 Ill. 2d 588, 596 (1977)).

¶ 17    Section 5-815 of the Act, which governs habitual juvenile offenders, provides:

"(a) Definition. Any minor having been twice adjudicated a delinquent minor for offenses which, had he been prosecuted as an adult, would have been felonies under the laws of this State, and who is thereafter adjudicated a delinquent minor for a third time shall be adjudged an Habitual Juvenile Offender where:

1. the third adjudication is for an offense occurring after adjudication on the second; and

2. the second adjudication was for an offense occurring after adjudication on the first; and

3. the third offense occurred after January 1, 1980; and the third offense occurred after January 1, 1980; and

4. the third offense was based upon the commission of or attempted commission of the following offenses: first degree murder, second degree murder or involuntary manslaughter; criminal sexual assault or aggravated criminal sexual assault; aggravated or heinous battery involving permanent disability or disfigurement or great bodily harm to the victim; burglary of a home or other residence intended for use as a temporary or permanent dwelling place for human beings; home invasion; robbery or armed robbery; or aggravated arson.

Nothing in this Section shall preclude the State's Attorney from seeking to prosecute a minor as an adult as an alternative to prosecution as an habitual juvenile offender.

* * *

(f) Disposition. If the court finds that the prerequisites established in subsection (a) of this Section have been proven, it shall adjudicate the minor an Habitual Juvenile Offender and commit him to the Department of Juvenile Justice until his 21st birthday, without possibility of parole, furlough, or non-emergency authorized absence. However, the minor shall be entitled to earn one day of good conduct credit for each day served as reductions against the period of his confinement. Such good conduct credits shall be earned or revoked according to the procedures applicable to the allowance and revocation of good conduct credit for adult prisoners serving determinate sentences for felonies." 705 ILCS 405/5-815 (West 2012).

¶ 18    The Illinois Supreme Court has previously held that the habitual juvenile offender provision of the Act is constitutional. *People ex rel. Carey v. Chrastka*, 83 Ill. 2d 67, 78-80 (1980). More specifically, relying on the United States Supreme Court's holding in *Rummel v. Estelle*, 445 U.S. 263 (1980), the Illinois Supreme Court in *Chrastka* found that "state legislatures have traditionally been allowed wide latitude in setting penalties for State crimes [citation], and we do not believe that the disposition authorized here rises to the level of cruel and unusual punishment by any stretch of the imagination." *Chrastka*, 83 Ill. 2d at 81-82; see also *Rummel*, 445 U.S. at 280-81, 284-85 (finding that the imposition of a life sentence with a possibility of parole under a recidivist statute upon a defendant convicted, successively, of fraudulent use of a credit card, passing a forged check, and obtaining money by false pretenses was not a cruel and unusual punishment).

¶ 19    In support of his argument that the habitual juvenile offender provision violates the eighth amendment and the proportionate penalties clause, respondent primarily relies on the United States Supreme Court's recent decision in *Miller*, 567 U.S. ___, 132 S. Ct. 2455. However, we find that, contrary to respondent's argument, the reasoning in *Miller* does not affect our supreme court's holding in *Chrastka*.

¶ 20    *Miller* involved two 14-year-old offenders that were convicted of murder and sentenced to mandatory life imprisonment without the possibility of parole. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460. The Supreme Court ultimately held that mandatory life sentences without the possibility of parole "for those under the age of 18 at the time of their crimes" violated the eighth amendment's prohibition against cruel and unusual punishments. *Id*. at ___, 132 S. Ct. at 2460. In coming to this conclusion, the Supreme Court relied on two of its previous decisions: *Roper v. Simmons*, 543 U.S. 551 (2005), and *Graham v. Florida*, 560 U.S. 48 (2010). *Miller*, 567 U.S. at ___, 132 S. Ct. at 2463-65. The Supreme Court explained:

"The cases before us implicate two strands of precedent reflecting our concern with proportionate punishment. The first has adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty. [Citation.] *** Several of the cases in this group have been specially focused on juvenile offenders, because of their lesser culpability. Thus, *Roper* held that the Eighth Amendment bars capital punishment for children, and *Graham* concluded that the Amendment also prohibits a sentence of life without the possibility of parole for a child who committed a nonhomicide offense. *Graham* further likened life without parole for juveniles to the death penalty itself, thereby evoking a second line of our precedents. In those cases, we have prohibited mandatory imposition of capital punishment, requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death. [Citations.] Here, the confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment.

*** *Roper* and *Graham* establish that children are constitutionally different from adults for the purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, 'they are less deserving of the most severe punishments.' [Citation.] Those cases relied on three significant gaps between juveniles and adults. First, children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable … to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' [Citation.]
        ***

*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing *the harshest sentences* on juvenile offenders, even when they commit terrible crimes." (Emphasis added.) *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464-65.

¶ 21 The Court emphasized that a mandatory sentence of life without parole for a juvenile did not allow for consideration of the juvenile's age and "its hallmark features–among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id*. at ___, 132 S. Ct. at 2465. The Court concluded that "in imposing a State's *harshest penalties*, a sentencer misses too much if he treats every child as an adult." (Emphasis added.) *Id*. at ___, 132 S. Ct. at 2468.

¶ 22 First, we note that *Miller*, *Roper*, and *Graham* all involved defendants who committed crimes when they were under the age of 18 years old, but were charged and convicted in the adult court system. See *Miller*, 567 U.S. at ___, 132 S. Ct. at 2461-63 (the two petitioners were 14 years old at the time they committed their crimes in separate cases and in both cases the respective prosecutors exercised discretion to charge the petitioners as adults); *Roper*, 543 U.S. at 557 (where the respondent was 17 years old when he committed his crime, he was outside the Missouri juvenile court system and tried as an adult); *Graham*, 560 U.S. at 53 (the petitioner was 16 years old at the time he committed his crime and the prosecutor elected to charge him as an adult). In addition, the Supreme Court's decision in *Miller* did not foreclose a court's ability to impose life without parole on a juvenile offender, although it expected "this harshest possible penalty will be uncommon." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. More importantly, the Court did not hold that the eighth amendment prohibited *any* mandatory penalties for juveniles, only mandatory natural life sentences without the possibility of parole, which is not at issue in the present case. *Id*. at ___, 132 S. Ct. at 2469. Finally:

> "*Graham*, *Roper*, and *Miller* stand for the proposition that a sentencing body must have the chance to take into account mitigating circumstances before sentencing a juvenile to the 'harshest possible penalty.' [Citation.] The harshest possible penalties involved in those cases, *i.e.*, the death penalty and life imprisonment without the possibility of parole, are simply not at issue here." *People v. Harmon*, 2013 IL App (2d) 120439, ¶ 54 (discussing whether the exclusive jurisdiction provision of the Act is unconstitutional).

¶ 23 Here, respondent was sentenced as a juvenile under the Act to commitment until the age of 21 years, a sentence that is not equivalent to being sentenced as an adult to death or to life without parole. In addition, respondent was only sentenced as a habitual juvenile offender to a mandatory commitment to the DJJ after he had committed two offenses that would have constituted a felony if he had been prosecuted as an adult, and a violent third offense that was specifically delineated by the legislature in the Act. 705 ILCS 405/5-815 (West 2012). The legislature is entitled to find that, in the case of a recidivist, violent offender such as respondent, there are no mitigating circumstances to allow for a lesser penalty. See *Taylor*, 102 Ill. 2d at 206 (finding that "[t]he rehabilitative objective of article I, section 11, should not and does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances" would make a sentence of less than natural life proper for the crimes of two or more murders). Therefore, we find that section 5-815 does not violate either the eighth amendment of the United States Constitution or the proportionate penalties clause of the Illinois Constitution.

¶ 24 Respondent relies on *People v. Miller*, 202 Ill. 2d 328 (2002), as additional support for his eighth amendment and proportionate penalty clause claim. However, we find *Miller* to be distinguishable. In *Miller*, the defendant, a 15-year-old juvenile, was convicted of two counts of first degree murder based on accountability based on a shooting that resulted in two murders and in which the defendant agreed to be the lookout. *Miller*, 202 Ill. 2d at 330-31. The

convergence of three statutes mandated a natural life sentence for the defendant, but the circuit court refused to impose the sentence, finding it in violation of the eighth amendment and the proportionate penalties clause. *Id*. at 331-32. Instead, the circuit court sentenced the defendant to 50 years' imprisonment. *Id*. at 332. The supreme court affirmed the judgment of the circuit court, because the mandatory natural life sentence "eliminate[d] the court's ability" to consider the defendant's "age or degree of participation in the crime." *Id*. at 340-42. Here, however, respondent was not convicted of a crime based on accountability and he was not sentenced to natural life imprisonment, one of the harshest possible penalties available, and therefore *Leon Miller* is inapposite to the present case.

¶ 25 Respondent also argues that *Chrastka* is not controlling because it relied on *Rummel*. Respondent reasons that *Rummel* "found that a mandatory minimum sentence of natural life for an adult offender did not violate the Eighth Amendment" and that the Supreme Court rejected *Rummel*'s application to juveniles sentenced to mandatory minimum sentences of life imprisonment in *Graham*. Respondent concludes that "the rationale behind the Illinois Supreme Court's decision in *Chrastka*" is therefore unsupported and "ripe for reconsideration." However, we first note that *Rummel* involved not just a mandatory life sentence, but also involved a recidivist statute under which he was sentenced to a mandatory natural life sentence only after he had been convicted of three felony convictions successively. *Rummel*, 445 U.S. at 264. Similarly in *Chrastka*, and in the present case, the respondents were sentenced as habitual juvenile offenders and to a mandatory minimum sentence of commitment until the age of 21 years as a result of recidivism. Therefore, we still find *Chrastka* to be applicable. Finally, as an appellate court, we are bound to honor our supreme court's conclusion on an issue "unless and until that conclusion is revisited by our supreme court or overruled by the United States Supreme Court" and, accordingly, we must follow the court's conclusion in *Chrastka. People v. Fountain*, 2012 IL App (3d) 090558, ¶ 23 (citing *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 836 (2004)).

¶ 26 Next, respondent contends that the habitual juvenile offender provision of the Act violates principles of due process and equal protection. Specifically, respondent argues that the habitual juvenile offender provision violates due process because there is no rational basis related to the legitimate government interest of the Act. Respondent further argues that the habitual juvenile offender provision violates equal protection principles because it treats younger juveniles "more harshly" than older juveniles, contrary to the idea of "lessened culpability" for the youngest juvenile offenders in *Miller*.

¶ 27 As discussed above, whether a statute is constitutional is a question of law and is therefore reviewed *de novo. Sharpe*, 216 Ill. 2d at 486-87. Statutes carry a strong presumption of constitutionality and, to overcome the presumption, the party challenging the statute has the burden of establishing that the statute violates the constitution. *Id*. at 487. "We generally defer to the legislature in the sentencing arena because the legislature is institutionally better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *Id*. "The legislature's discretion in setting criminal penalties is broad, and courts generally decline to overrule legislative determinations in this area unless the challenged penalty is clearly in excess of the general constitutional limitations on this authority." *Id*.

¶ 28 The due process clauses of the United States and Illinois Constitutions provide that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const., amend. XIV, Ill. Const. 1970, art. I, § 2. A statute violates substantive due process when there

is no rational relationship between the classification in the statute and a legitimate governmental purpose. *People v. Williams*, 329 Ill. App. 3d 846, 851 (2002).

¶ 29    The constitutional guarantee of equal protection requires the government to treat similarly situated individuals in a similar manner. *People v. Breedlove*, 213 Ill. 2d 509, 518 (2004). If a statute does not affect a fundamental right or involve a suspect class, it need only satisfy the rational basis test. *Id*. Under the rational basis test, review is generally limited and deferential: it simply inquires whether the means employed by the statute to achieve the stated purpose of the legislation are rationally related to the purpose of the statute. *Id*. A statute will be upheld under rational basis review if there is any conceivable set of facts to show a rational basis for the statute. *People v. Johnson*, 225 Ill. 2d 573, 585 (2007). Moreover, although the language used to describe the requirements for due process and for equal protection differs slightly, both have identical standards of validity. *People v. Reed*, 148 Ill. 2d 1, 11 (1992).

¶ 30    Section 5-101 of the Act sets forth the Act's purpose as promoting "a juvenile justice system capable of dealing with the problem of juvenile delinquency, a system that will protect the community, impose accountability for violations of law and equip juvenile offenders with competencies to live responsibly and productively." 705 ILCS 405/5-101 (West 2012). In order to "effectuate this intent," the following were declared to be "important purposes": (1) protecting citizens from juvenile crime; (2) holding each juvenile offender directly accountable for his acts; (3) providing an individualized assessment of each alleged and adjudicated delinquent juvenile in order to rehabilitate and prevent further delinquent behavior; and (4) to provide due process through which each juvenile offender and all interested parties will receive fair hearings and where legal rights are enforced and recognized. 705 ILCS 405/5-101(1) (West 2012). Section 5-101 also discusses various policies meant to help accomplish the listed goals, including protecting the community from crimes committed by minors, allowing minors to reside at home whenever possible, and holding minors accountable for their unlawful behavior and not allowing minors to think their delinquent acts have no consequences for themselves or others. 705 ILCS 405/5-101(2) (West 2012).

¶ 31    Our state supreme court has previously conclusively found that the habitual juvenile offender provision in the Act was constitutional. *Chrastka*, 83 Ill. 2d at 79. There, similar to the present case, the respondents argued that the habitual juvenile offender provision violated their rights to due process and equal protection. *Id*. at 78-80. The supreme court concluded that, despite the habitual juvenile offender provision requiring mandatory commitment until the age of 21 years, the means chosen by the legislature were reasonably designed to remedy the evils which the legislature had determined to be a threat to the public health, safety, and welfare. *Id*. at 79. The court explained:

> "Under the Act, the court is dealing with a juvenile who has allegedly committed three offenses within what is necessarily a short period of time. Significantly, the two predicate adjudications afforded the juvenile the opportunity to have a hearing at which he could present mitigating evidence and at which the trial judge could exercise his discretion in determining the appropriate disposition. Additionally, the two predicate adjudications must have been for offenses which would have been felonies if the individual were prosecuted as an adult [citation], and the third offense must be of a particularly serious nature to warrant the disposition authorized by the Act [citation]. The legislature could legitimately conclude that an individual who has committed three such offenses benefited little from the rehabilitative measures of the juvenile court

system and exhibits little prospect for restoration to meaningful citizenship within that system as it had heretofore existed. The rehabilitative purposes of the system are not completely forsaken, but after the commission by an individual of a third serious offense, the interest of society in being protected from criminal conduct is given additional consideration. We consider it to be entirely reasonable and constitutionally permissible for the legislature to so provide and to authorize the disposition specified in the legislative scheme it has developed." (Emphases omitted.) *Id*. at 79-80.

See also *People v. Taylor*, 221 Ill. 2d 157, 170 (2006) (observing that a policy that seeks to "hold juveniles accountable for their actions and to protect the public does not negate the concept that rehabilitation remains a more important consideration in the juvenile justice system than in the criminal justice system and that there are still significant differences between the two").

¶ 32    The supreme court in *Chrastka* also found no equal protection violation because it believed "the interest in protecting society from the habitual juvenile offender has, through experience, proved to be as compelling as the interest in protecting society from the habitual adult offender, and the broad authority of State legislatures to deal with adult recidivists is well recognized." *Chrastka*, 83 Ill. 2d at 81. The court concluded that the possible variance in the ages of habitual juvenile offenders did not serve to invalidate the means chosen to effectuate the purpose of the Act, because the " 'Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences.' " *Id*. (quoting *Williams v. Illinois*, 399 U.S. 235, 243 (1999)).

¶ 33    Respondent again relies on the Supreme Court's reasoning in *Miller*, *Roper*, and *Graham*, for support. However, as we discussed above, we find these cases to be inapposite to the present case, deciding only the more narrow issue that a sentencing body "must have the chance to take into account mitigating circumstances before sentencing a juvenile to the 'harshest possible penalty.' " *Harmon*, 2013 IL App (2d) 120439, ¶ 54 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2475). Respondent's sentence of mandatory commitment to the DJJ until the age of 21 years is not one of these harshest possible penalties. As we discussed above, we are bound to honor the supreme court's conclusion unless and until our supreme court revisits the issue or is overruled by the United States Supreme Court and are bound by the decision in *Chrastka*. *Fountain*, 2012 IL App (3d) 090558, ¶ 23. Therefore, we conclude that the habitual juvenile offender provision of the Act does not violate the principles of constitutional due process or equal protection.

¶ 34    For the forgoing reasons, we affirm the judgment of the circuit court.

¶ 35    Affirmed.