2023 IL App (1st) 231146-U

No. 1-23-1146

Second Division
December 29, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| *In re* D.B., a Minor, | ) | Circuit Court of |
| | ) | Cook County. |
| (The People of the State of Illinois, Petitioner-Appellee, | ) | |
| | ) | |
| | ) | No. 19 L 10001 |
| v. | ) | |
| | ) | Honorable |
| D.B., | ) | Stuart F. Lubin |
| | ) | Judge, Presiding. |
| Respondent-Appellant.) | ) | |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Respondent's constitutionality challenges to the subsections of the AUUW and UPF statutes, imposing age-based restrictions on firearms possession, fail where there is no violation of the second amendment, either facially or as-applied to respondent. The trial court's adjudication is affirmed where there was sufficient evidence to find respondent guilty beyond a reasonable doubt of AUUW, and the trial court did not err in entering the order of commitment.

¶ 2     Following a bench trial, the trial court adjudicated minor-respondent D.B. delinquent of

two counts of aggravated unlawful use of a weapon (AUUW) and one count of unlawful possession

of a firearm (UPF) and sentenced him to an indeterminate period not to exceed seven years or D.B.'s 21st birthday, whichever occurs first. Respondent appeals from the adjudication of delinquency and order of commitment. On appeal, respondent argues that: (1) the AUUW and UPF statutes violate the second amendment of the United States Constitution; (2) the State failed to prove him guilty of AUUW beyond a reasonable doubt; and (3) the trial court's order of commitment violated section 5-750(3) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/5-750(3) (West 2022)). For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On March 28, 2023, the State filed a petition for adjudication of wardship against then 16-year-old D.B., charging him with two counts of AUUW in that he was under 21 years old and in possession of a handgun while not on his own land and had not been issued a valid Firearm Owner's Identification (FOID) card (count 1) (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2022)); was not engaged in wildlife activities (count 2) (720 ILCS 5/24-1.6(a)(1), (a)(3)(I)); and, one count of UPF in that he was under 18 years old and in possession of a firearm of a size that could be concealed on his person (count 3) (720 ILCS 5/24-3.1(a)(1)).

¶ 5      The case proceeded to a bench trial, at which the following evidence was adduced.

¶ 6      Chicago police officer John Pham testified that, on March 27, 2023, at 11:10 p.m., he responded to a call of multiple shots fired in the area of 3332 West Evergreen Avenue in Chicago, Illinois. As he approached the area, Pham observed an individual detained by another police unit and, as he exited his vehicle, he observed another individual "wearing a dark hood, black mask with a light-colored studded belt" in a gangway. The individual was "coming through the gangway with a weapon in his right hand," which Pham described as "a black semi-automatic pistol." Pham announced his office and directed the individual to drop the weapon. The individual fled north

through the gangway and Pham followed. Pham testified that the individual was about 20 to 30 feet ahead of him. The individual "proceeded westbound in the alley just north of Evergreen" and "towards the CHA housing located approximately [at] 3346 West Evergreen." Pham went through the gangway to the front of 3346 West Evergreen, where he saw the individual again. Pham directed the nearby marked unit to stop the individual. The individual, who Pham identified as the same individual he saw with the weapon based on his clothing, was then detained. The individual was no longer wearing a mask, however, a mask was found on the ground next to him. A weapon was not recovered from respondent's person. Pham then retraced the steps of respondent and recovered a loaded, black, semi-automatic pistol from the gangway of 3346 West Evergreen. Pham testified that the firearm was of a size that could be concealed on a person and, further, that respondent was not engaged in any activities under the Wildlife Code.

¶ 7    During processing, Pham learned that respondent was 16 years old. When asked, "Did you learn during processing whether he had a FOID card?", Pham responded, "He did not have a FOID card or CCL, correct." In court, Pham identified the individual as respondent.

¶ 8    The State then introduced into evidence and played a video from Pham's body-worn camera showing the events of March 27, 2023. The video footage shows Pham announcing his office, ordering an individual to drop his weapon. Pham then chases after the individual through a gangway and into an alley. At this point, Pham loses sight of the individual and runs through another gangway. After exiting the gangway, he sees respondent down the street and officers who had just arrived on the scene detain him.

¶ 9    On cross-examination, Pham confirmed that there was another individual in the vicinity, three doors down from the gangway where the firearm was recovered. He stated that he lost sight

- 3 -

of respondent briefly in the alley and he recovered the firearm in a gangway which Pham had not run through. (Different from the gangway through which he had been chasing the individual?)

¶ 10    The trial court took judicial notice of respondent's 2021 adjudication of AUUW.

¶ 11    Respondent's motion for a directed finding was denied. Following closing arguments, the trial court found him delinquent of two counts of AUUW and one count of UPF and adjudicated him a ward of the court. Counts 2 and 3 were merged into count 1.

¶ 12    Respondent was sentenced to an indeterminate period not to exceed seven years or respondent's 21st birthday, whichever occurred first. In particular, and as is relevant to the issues herein, the order of commitment provides:

> "[T]he minor be committed to the Illinois Department of Juvenile Justice *** [f]or an indeterminate period as provided in 705 ILCS 405/5-750(1) and (3), not to exceed (a) that period for which an adult could be committed for the same act, or (b) the minor's 21st birthday, whichever occurs first. The minor may be held in a Department facility without being released for a maximum term of 7 years as provided in 705 ILCS 405/5-710. (NOTE: The term provided may be less than but shall not exceed the max imprisonment the court could impose for an adult under Unified Code of Corrections Chapter V[.])"

¶ 13    This appeal followed.

¶ 14                                    II. ANALYSIS

¶ 15    On appeal, respondent argues that this court should reverse the findings of delinquency because the AUUW statute and the UPF statute violate the second amendment of the United States Constitution. He also argues that there was insufficient evidence to find him guilty of AUUW based on his lack of a FOID card and the trial court's order of commitment violated the Juvenile Court Act.

¶ 16                              A. Constitutional Challenges

¶ 17    Respondent first contends that the statutes upon which the findings of delinquency were based, namely the AUUW statute and the UPF statute, violated the second amendment of the U.S. Constitution. He relies on *New York Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), to support his argument that the subsections of the AUUW statute requiring individuals to obtain a FOID card and banning individuals under 21 years old from carrying firearms in public unless they are engaging in wildlife activities or at a gun range, and the UPF statute's ban on individuals under 18 years old from possessing concealable firearms, are facially unconstitutional because there is no historical precedent for them. He additionally argues that these statutes are unconstitutional as applied to him because there are no historical analogues for age-based restrictions on the right to bear arms and the facts do not show that he was dangerous at the time of the offense.

¶ 18    " 'Constitutional challenges carry the heavy burden of successfully rebutting the strong judicial presumption that statutes are constitutional.' " *People v. Rizzo*, 2016 IL 118599, ¶ 23 (quoting *People v. Patterson*, 2014 IL 115102, ¶ 90). "That presumption applies with equal force to legislative enactments that declare and define conduct constituting a crime and determine the penalties imposed for such conduct." *Id.* To overcome that presumption, the party challenging the statute must "clearly establish any constitutional invalidity." *Allegis Realty Investors v. Novak*, 223 Ill. 2d 318, 334 (2006). "[T]his court will uphold a statute's validity whenever it is reasonably possible to do so." *Id.* Whether a statute is constitutional is an issue that we review *de novo*. *Id.*

¶ 19    The second amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The statutory provisions at issue here provide the following. The AUUW statute

requires individuals to obtain a FOID card in order to possess a handgun. 720 ILCS 5/24-1.6(a)(1), (a)(3)(C). That statute also prohibits anyone under the age of 21 years old from possessing a handgun outside the home, unless the person is engaged in specific activities under the Wildlife Code or at a gun range. 720 ILCS 5/24-1.6(a)(1), (a)(3)(I). The UPF statute prohibits anyone under the age of 18 years old from possessing a concealable firearm. 720 ILCS 5/24-3.1(a)(1).

¶ 20                                    1. Facial Challenge

¶ 21     A facially unconstitutional statute is void *ab initio*, meaning that "the statute was constitutionally infirm from the moment of its enactment and, therefore, unenforceable." *People v. Thompson*, 2015 IL 118151, ¶ 32. A facial constitutional challenge requires a showing that the statute is unconstitutional under any set of facts. *Rizzo*, 2016 IL 118599, ¶ 24. Such a challenge is "the most difficult challenge to mount" because a statute is facially unconstitutional only if there are no possible circumstances in which the statute could be validly applied. *People v. Davis*, 2014 IL 115595, ¶ 25.

¶ 22     Respondent argues that the United States Supreme Court's *Bruen* decision constituted a "doctrinal reset" and changed the analysis for firearm regulations to "an exclusively historical approach" and makes unconstitutional "any gun regulation that does not have a relevant body of historical analogues." He further asserts that "requirements of FOID cards, bans on public possession of handguns by persons under 21 years old, and complete bans on possession of concealable firearms by persons under 18 years old would have been unknown to those who ratified the Constitution," and thus, these prohibitions violate the second amendment.

¶ 23     We first point out that our supreme court has previously rejected challenges to these same age-based restrictions on firearm possession and upheld the statutory provisions at issue. See *People v. Mosley*, 2015 IL 115872, ¶¶ 33-38; *In re Jordan G.*, 2015 IL 116834, ¶¶ 21-25; *People*

*v. Aguilar*, 2013 IL 112116, ¶¶ 24-28. Although our supreme court's decisions were issued prior to *Bruen*, the most recent landmark decision expounding upon the second amendment, as we will explain, we do not find that the advent of *Bruen* demands a different outcome.

¶ 24    Prior to *Bruen*, a two-part test was utilized for evaluating the constitutionality of a firearm regulation under the second amendment in accordance with *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), which we refer to herein as the *Heller* test, the Illinois Supreme Court adopted its version of the *Heller* test in *Wilson v. County of Cook*, 2012 IL 112026. Under *Wilson*, the first step of the test requires the reviewing court to conduct a "textual and historical inquiry" to determine whether the challenged statute regulates conduct that is covered by the second amendment's protections at the time of its ratification. *Id.* ¶ 41. The regulated conduct is categorically unprotected if it does not fall within the scope of the second amendment as originally understood. *Id.* If history proved inconclusive or suggested that the regulated conduct was not "categorically unprotected," then the court, applying the appropriate level of scrutiny, conducted an inquiry into the strength of the state's justification for regulating the conduct, then the court moved on to the second step and, applying the appropriate level of scrutiny, conducted an inquiry into the strength of the state's justification for regulating the conduct, or a "means-end analysis." *Id.* ¶ 42. Our supreme court would have occasion to apply its newly minted test in the three cases cited above, *Aguilar*, *Mosley*, and *Jordan G.*

¶ 25    Beginning with *Aguilar*, the Illinois Supreme Court addressed, *inter alia*, the constitutionality of the UPF statute. 2013 IL 112116, ¶ 24. Specifically, the defendant argued that the provision of the UPF statute prohibiting persons under 18 years of age from possessing a firearm of a concealable size violated the second amendment because at the time the amendment was drafted and ratified, the right to keep and bear arms extended to persons 16 and 17 years of

age. *Id.* ¶ 25. In its review of the second amendment's history, the supreme court noted that several courts since *Heller* have concluded that "the possession of handguns by minors is conduct that falls outside the scope of the second amendment's protection." *Id.* ¶ 27 (citing cases). The court continued, stating that "nothing like *a right* for minors to own and possess firearms has existed at any time in this nation's history" and "laws banning the juvenile possession of firearms have been commonplace for almost 150 years[.]" (Emphasis original.) *Id.* The supreme court thus concluded that "possession of handguns by minors is conduct that falls outside the scope of the second amendment's protection" and rejected the defendant's second amendment challenge to the age-based restriction in the UPF statute. *Id.* ¶¶ 27-28.

¶ 26 Two years later, in *Mosley*, our supreme court considered whether the provision of the AUUW statute restricting persons under the age of 21 who are not engaged in lawful hunting activities from possessing firearms was constitutional under the *Wilson* test. 2015 IL 115872, ¶ 37. The court held that the restriction was "both historically rooted and not a core conduct subject to second amendment protection" and the provision provided for "multiple exceptions and exemptions to protect the rights of law-abiding persons under the age of 21." *Id.* Because the provision satisfied the first step of the *Wilson* test, the court did not engage in a means-end analysis under the second step. *Id.*

¶ 27 Finally, in *Jordan G.*, at issue were the provisions of the AUUW statute prohibiting (1) possession of a firearm without a FOID card, which is restricted to persons 21 years old and older, and (2) possession of firearm for anyone under 21 years old who is not engaging in wildlife activities or at a gun range. 2015 IL 116834, ¶ 21. The 16-year-old respondent argued that those provisions were facially unconstitutional because they constituted "blanket age restrictions" against firearm possession. *Id.* The supreme court, following the *Wilson* two-step test, rejected the

respondent's second amendment challenge. The court held that *Aquilar*'s conclusion that age-based restrictions on the right to keep and bear arms are historically rooted applied equally to those persons under 21 years of age. *Id.* ¶¶ 22-25.

¶ 28    In *Aquilar*, *Mosley* and *Jordan G.*, our supreme court's analysis proceeded under the test espoused in *Wilson*. The *Wilson* test, as we noted earlier, grew out of the *Heller* test. However, in *Bruen*, the Supreme Court modified the *Heller* test for evaluating the constitutionality of firearm regulations.

¶ 29    In *Bruen*, the Court was tasked with determining the constitutionality of New York's firearm licensing regime, which required applicants to establish that "proper cause" existed for licensure. *Bruen*, 142 S. Ct. at 2123. The Court ultimately held that the regime was unconstitutional, reasoning that the "proper cause" requirement allowed the government too much discretion to deny a license to an applicant seeking to possess a firearm out of a generalized desire for self-defense. *Id.* at 2156. In so concluding, the Court held that the test used since *Heller* was "one step too many" and rejected any means-end analysis in the context of the second amendment. *Id.* at 2127, 2131. Instead, the Court insisted upon a test where the "plain text" and history would be the sole considerations. *Id.* at 2129-30. At the first step, an individual's conduct is presumptively protected by the constitution if the conduct is covered by the second amendment's plain text. *Id.* Second, if the individual's conduct is covered by the second amendment, then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

¶ 30    In *Aguilar*, *Mosley*, and *Jordan G.*, our supreme court, in following the *Wilson* test, concluded that it need not reach the second step, namely the means-end scrutiny, because age-based restrictions were historically rooted and minors' rights to possession of firearms fell outside

the scope of the second amendment. Under the test post-*Bruen*, the second step is eliminated and the focus is on the plain text and history. Contrary to respondent's assertion, because our courts have never reached the means-end step, we would hardly classify the *Bruen* test as a "doctrinal reset" as it pertains to age-based restrictions in Illinois. Historical analysis has been the focal point for our supreme court and it continues to be so under *Bruen*.

¶ 31    In the case at bar, we need not consider *Bruen*'s first step because, even if we concluded that a minor's right to keep and bear arms is covered by the second amendment's plain text, our supreme court has already answered the second step. In those three cases, the court explicitly addressed the historical roots of age-based restrictions on the right to keep and bear arms. In *Aguilar*, the supreme court cited to several cases finding it clear from a review of the relevant historical record that age-based restrictions on minors' access to firearms were commonplace and persisted well beyond the Founding Era. *Id.* ¶ 27. In particular, *Aguilar* cited *United States v. Rene E.*, 583 F. 3d 8 (1st Cir. Aug. 31, 2009), which reviewed a federal statute prohibiting handgun possession by juveniles with exceptions and exemptions. The *Rene* decision contains a section titled, "Evidence of the Founders' attitudes[,]" as well as sections setting forth congressional and state regulations limiting juvenile access to firearm from as early as the mid-19th century. *Rene*, 583 F. 3d at 15-16. In concluding that the statute did not "offend the Second Amendment[,]" the court stated that it had "evaluated evidence that the founding generation would have regarded such laws as consistent with the right to keep and bear arms." *Id.* at 16. Thus, *Aguilar*'s conclusion rested upon evidence dating back to the Founding Era. See *Bruen*, 142 S. Ct. at 2131-32 (stating that the government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." (Internal quotation marks omitted.).

¶ 32     As in *Aguilar*, we decline recitation of the extensive historical evidence contained in those decisions. However, we would note some additional historical evidence. There are at least two laws from the Founding Era that support regulations on minors' access to firearms. In 1763, a New York City law created criminal sanctions for "Children, Youth, apprentices, Servants, and other persons" who fire a gun in certain public places. Ordinances of the City of N.Y., § 6 (1763), reprinted in *Laws, Statutes, Ordinances and Constitutions Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City* 11. In 1786, another New York City law created criminal sanctions for firing a gun anywhere in the city and stated that "it is hoped that the good citizens will exert themselves in restraining their children *** from offending against the same." N.Y. City, N.Y., Act of Apr. 22, 1786, reprinted in *The Daily Advertiser* (N.Y. City, N.Y.) (Dec. 30, 1788). Moreover, individuals under the age of 21 were considered minors or "infants" at common law. See also *Black's Law Dictionary* (11th ed. 2019) ("Every person is, at the common law, considered an infant, or minor, until he has reached the age of twenty-one years[.]" (quoting Lewis Hochheimer, *A Treatise on the Law Relating to the Custody of Infants* 1 (2d. ed. 1891)); *id.* ("The common-law rule provided that a person was an infant until he reached the age of twenty-one." (quoting John Edward Murray Jr., *Murray on Contracts*, § 12, at 18 (2d ed. 1974)).

¶ 33     In any case, our supreme court in *Aguilar* determined that age-based restrictions are consistent with our country's historical tradition of firearm regulation. *Id.* ¶ 27. Subsequently, *Mosley* and *Jordan G.* adopted *Aguilar*'s reasoning and concluded that it applied to persons under 21 years of age. *Jordan G.*, 2015 IL 116834, ¶ 25; *Mosley*, 2015 IL 115872, ¶¶ 36-38. Contrary to respondent's assertion, *Bruen* does not disturb these holdings.

¶ 34 Moreover, this court "lacks authority to overrule decisions of [the supreme court], which are binding on all lower courts." *People v. Artis*, 232 Ill. 2d 156, 164 (2009). Thus, regardless of respondent's arguments and citations, our supreme court has already passed upon this issue and determined that age-based restrictions are historically rooted in this nation's traditions. See *In re A.P.*, 2014 IL App (1st) 140327, ¶ 25 ("[A]s an appellate court, we are bound to honor our supreme court's conclusions on an issue unless and until that conclusion is revisited by our supreme court or overruled by the United States Supreme Court[.]" (citations and quotation marks omitted)). As such, we conclude that the age-based restrictions contained in the AUUW and UPF statutes are not unconstitutional. *Contra Firearms Policy Coalition, Inc. v. McCraw*, 623 F. Supp. 3d 740 (Aug. 25, 2022) (concluding that there was not sufficient evidence showing a Founding Era tradition of restricting those under 21 years old from possessing firearms and thus Texas's statutory scheme violated the second amendment).

¶ 35 Although our supreme court precedent is more than sufficient to resolve respondent's constitutional challenges, other aspects of the *Bruen* decision bolster our conclusion that the age-based restrictions contained within the AUUW statute, as well as the FOID Card Act, do not violate the second amendment.

¶ 36 As the State correctly points out, the Court in *Bruen* expressly endorsed "shall-issue" regimes like the one employed here in Illinois, as opposed to the "may-issue" regime employed in New York. Specifically, in a footnote, the *Bruen* Court stated:

> "To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].' [Citation.] Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do

not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry. [Citation.] Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' *Ibid.* And they likewise appear to contain only 'narrow, objective, and definite standards' guiding licensing officials, [citation], rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion,' [citation]—features that typify proper-cause standards like New York's." 142 S. Ct. at 2138 n. 9.

¶ 37    The import of this footnote is reiterated in the concurring opinions of Justice Kavanaugh and Justice Alito. Justice Kavanaugh's concurrence stressed that the Court's decision "does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense" and specified that the decision "does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 States." *Id.* at 2161 (Kavanaugh, J., concurring, joined by Roberts, C.J.). Justice Cavanaugh further declared, "Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so." *Id.* at 2162  (Kavanaugh, J., concurring, joined by Roberts, C.J.). Justice Alito's concurrence stated, "Our holding decides nothing about *** the requirements that must be met to buy a gun." *Id.* at 2157. And most significantly, Justice Alito, in rejecting the relevancy of the dissent's statistics on children and adolescents killed by guns, noted that the decision "does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18[.]" *Id.* at 2157-58 (Alito, J., concurring).

¶ 38 The State contends that, per that footnote, as well as the concurrences, the Court has endorsed Illinois' licensing regimes for possessing firearms, which place restrictions on individuals under the age of 21 from possessing firearms, and thus, has implicitly recognized the constitutionality of the AUUW statute. We agree. Both the FOID Card Act and the Conceal Carry Act provide that the Illinois State Police "shall issue" a license to any applicant who meets the well-defined, objective criteria contained therein. 430 ILCS 65/5 (West 2022); 430 ILCS 66/10 (West 2022). Both statutory schemes also require applicants to be 21 years old or older. 430 ILCS 65/4; 430 ILCS 66/25. Another requirement of a CCL is a valid FOID card. *Id.* Thus, the FOID Card Act and its requirements are incorporated in the Concealed Carry Act, which the *Bruen* Court expressly listed as a shall-issue regime in another footnote (see 142 S. Ct. at 2123 n. 1). Accordingly, we find that the Court has given its tacit approval of Illinois' shall-issue licensing regime, as well as the AUUW statute, because the age-based restrictions, as well as the other criteria, contained therein are "narrow, objective, and definite standards." See also *People v. Gunn*, 2023 IL App (1st) 221032, ¶ 32 ("Illinois is a *shall-issue* state with clearly defined, objective criteria regarding firearm possession and carry.") (Emphasis in original.).

¶ 39 Nonetheless, respondent contends that Illinois is not a "shall-issue" state with regard to CCLs because an applicant will not meet the requirement of completion of a firearms training course if the applicant "does not follow the orders of the certified firearms instructor." He also argues that the Supreme Court's comments regarding other states' licensing regimes merely constitutes *dicta*.

¶ 40 We first reject respondent's argument that the CCL requirement to comply with the orders of a certified firearms instructor renders the statute proscriptively discretionary. First, the Court in *Bruen* specifically approved the requirement of a firearms training course, stating that such

requirements are included to ensure that those bearing arms are law-abiding, responsible citizens. 142 S. Ct. at 2138 n. 9. Second, "[a] firearms training course would serve no purpose if all the applicant was required to do was to be physically present and ignore the instruction." *Gunn*, 2023 IL App (1st) 221032, ¶ 27.

¶ 41    Still, respondent notes that the Court stated in *Bruen* that it would "not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n. 9. According to respondent, the Court has expressly allowed for potential challenges to even shall-issue licensing regimes and thus, his challenge is valid. However, respondent's challenge does not involve either lengthy wait times or exorbitant fees, and we have already concluded that the age-based restrictions are not unconstitutional.[1]

¶ 42    We also reject respondent's request to dismiss the Court's language as mere *dicta*. There are two types of *dicta*. "*Obiter dicta* are comments in a judicial opinion that are unnecessary to the disposition of the case." *People v. Williams*, 204 Ill. 2d 191, 206 (2003). Judicial *dicta*  are also comments that are unnecessary to the disposition of the case, "but involve an issue briefed and argued by the parties." *Id.* For that reason, judicial *dicta* "have the force of a determination by a reviewing court and should receive dispositive weight in an inferior court." *Id.* (citing *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993)). *Obiter dicta*, typically not binding as authority or precedent, can also be "tantamount to a decision and therefore binding in the absence of a contrary decision" of a court of last resort. *Cates*, 156 Ill. 2d at 80. We are unaware of any Supreme Court decision that

---

[1] In his brief on appeal, defendant cites a law review article asserting that the average wait time for a FOID card was actually 51 days amid record-high demand in the summer of 2020. Even accepting this information as true for the sake of argument, we still cannot say it rises to the level of a constitutional violation.

contradicts the Court's own footnote. Moreover, Justice Alito in his concurrence expressly stated that the *Bruen* decision did not disturb "anything said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring). As such, we will heed *Bruen*'s unambiguous efforts to exclude shall-issue regimes, like the one employed in Illinois that contains age-based restrictions for individuals under 21 years of age, from its decision.

¶ 43    Finally, respondent argues that the AUUW statute is facially unconstitutional because the method by which an 18- to 20-year old can obtain a FOID card is dependent on the "arbitrary circumstances of their parentage" or the discretion of the Director of the State Police, which creates a "may-issue" regime that prevents persons from exercising their constitutional rights. See 430 ILCS 65/4(a)(2)(I) (West 2022) (providing that an applicant under 21 years old can obtain a FOID card with a parent's or guardian's consent); 430 ILCS 65/10(c) (West 2022) (stating that a person prohibited from acquiring a FOID card may apply to the FOID card review board to request relief from such prohibition).

¶ 44    In response, the State asserts that respondent does not have standing to challenge the FOID Card Act because there is no evidence that respondent ever attempted to obtain a FOID card and was subsequently denied. This court has rejected the State's argument on previous occasions and we do so here as well. See *People v. Fulton*, 2016 IL App (1st) 141765, ¶ 19 (defendant had standing to challenge his conviction for being an armed habitual criminal despite never applying for a FOID card); *Gunn*, 2023 IL App (1st) 221032, ¶ 25, n. 1 (rejecting State's argument that defendant convicted of AUUW lacked standing to challenge the Conceal Carry Act). In the instant case, respondent was adjudicated delinquent under the AUUW statute for failure to possess a FOID card, and thus, the AUUW statute incorporates the requirements of the FOID Card Act. Because

respondent "has sustained or is in immediate danger of sustaining some direct injury as a result of the statute[,]" we conclude that he has standing. (Internal quotations omitted.) *Aguilar*, 2013 IL 112116, ¶ 12.

¶ 45    Nonetheless, respondent's argument is meritless. First, as we have made clear above, *Bruen* recognized the constitutionality of Illinois' licensing regime, which includes the FOID Card Act. Second, after performing the requisite historical analyses, Illinois courts have repeatedly held that the FOID card requirement of the AUUW statute is constitutional. See *Mosley*, 2015 IL 115872, ¶¶ 34-36 (finding that the FOID card requirement is consistent with the Illinois Supreme Court's "recognition that the second amendment right to possess firearms is still subject to meaningful regulation"); *People v. Wiggins*, 2016 IL App (1st) 153163, ¶¶ 76-81 ("[I]t is constitutional to require an individual to comply with a licensure process before permitting a person to possess a handgun in Illinois."); *People v. Taylor*, 2013 IL App (1st) 110166, ¶¶ 28-32 (finding that, under the " 'text, history and tradition' approach," the FOID card requirement in the AUUW statute "does not violate the right to bear arms guaranteed under the second amendment"). Third, the "discretionary" options available for an individual under 21 years old to obtain a FOID card does not transform the FOID Card Act into a "may-issue" statute like the regime denounced in *Bruen* because, as we have made clear, individuals under 21 years old do not have a constitutional right to keep and bear arms. Thus, we reject respondent's arguments related to the constitutionality of the FOID Card Act.

¶ 46    Accordingly, we conclude that *Bruen* does not provide any basis for declaring either the AUUW or UPF statute facially unconstitutional.

¶ 47                                    2. As-Applied Challenge

¶ 48 Respondent also argues that the AUUW and UPF statutes are unconstitutional as applied to him because there are no historical analogues for age-based restrictions on firearm possession and the facts do not show that he was dangerous at the time of the offense.

¶ 49 We must first address the State's argument that respondent's as-applied challenge is forfeited because it was raised for the first time in this appeal. Certainly, it is well settled that failure to raise an issue in the trial court results in forfeiture of the issue in the reviewing court. *People v. Rodriguez*, 2021 IL App (1st) 200173, ¶ 58. Although facial constitutional challenges may be raised at any time, the same is not true for as-applied constitutional challenges. See *People v. Thompson*, 2015 IL 118151, ¶¶ 32-37. A facial challenge alleges that the statute is unconstitutional under any set of facts, but an as-applied challenge alleges only that the statute violates the constitution as applied to the particular set of facts and circumstances of the case at bar. *Id.* ¶ 36. Because as-applied challenges are dependent on the particular facts of the individual, "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Id.* ¶ 37.

¶ 50 However, where "[a]ll facts and circumstances to decide the defendant's claim *** are already in the record[,]" the claim may be raised <u>on appeal for the first time</u> and reviewed. *People v. Holman*, 2017 IL 120655, ¶ 32, *overruled on other grounds by People v. Wilson*, 2023 IL 127666, ¶ 42; see also *People v. Martin*, 2018 IL App (1st) 152249, ¶¶ 12-13; but see *People v. Baker*, 2023 IL App (1st) 220328, ¶ 35 n. 11 (stating that *Thompson* is "completely inapposite because it concerns the special rules governing a section 2-1401 petition"). The parties agree that respondent's as-applied challenge turns on the factual issue of whether he was dangerous at the time of the offense, or stated another way, whether he is a peaceable person, and there is no dispute that this particular issue was not litigated in the trial court.

¶ 51    Respondent contends that the record is sufficiently developed to review his as-applied challenge. We agree. The trial testimony sufficiently apprises the court of circumstances that led to respondent's adjudications of delinquency and the nature of respondent's conduct during the incident. The record also contains respondent's presentencing investigation (PSI) report. Although the State makes a general assertion that it could have "offered additional, compelling evidence to defeat [respondent's] claim" in the court below, it does not specify what that evidence might be. Thus, we find that there are sufficient facts in the record to review this issue. See *Martin*, 2018 IL App (1st) 152249, ¶ 13 (the defendant's criminal history, the trial evidence, the facts presented during the sentencing hearing and in the defendant's PSI were sufficient to review the defendant's as-applied constitutional challenge to the armed habitual criminal statute).

¶ 52    Turning to the merits, we first reject respondent's argument that the historical record does not support the age-based restrictions contained in the AUUW and UPF statutes. This argument has already been discussed in detail and rejected and we need not revisit it here.

¶ 53    Next, respondent argues that the facts do not show that he was dangerous where he was never seen actually firing the gun and he has no previous adjudications involving the actual firing of a firearm. In response, the State maintains that respondent is "not a peaceable person" where the record shows that multiple shots were fired, respondent fled when Pham arrived on the scene, and he discarded a loaded gun in a public gangway.

¶ 54    We agree with the State that the record does not demonstrate that respondent is a peaceable person. The circumstances of this case involve respondent's unlawful possession of a loaded handgun, that he carelessly discarded in a public gangway after fleeing from police. We note that law enforcement was dispatched to the scene due to a report of shots fired but there is no evidence that respondent fired any shots. A review of his PSI shows that he has a prior adjudication for

AUUW and he was also arrested for battery which resulted in his placement into a diversion program. The PSI also shows that he was suspended from school once due to fighting. Despite respondent's assertions to the contrary, we are of the mind that a 16-year-old's handling of illegal firearms is not demonstrative of a peaceable person. As such, respondent's as-applied challenge fails.

¶ 55                                    B. Sufficiency of the Evidence

¶ 56    Next, respondent asserts that the State failed to prove beyond a reasonable doubt that he committed the offense of AUUW pursuant to 720 ILCS 5/24-1.6(a)(2), (3)(C). Specifically, he argues that the State did not present "any actual evidence" regarding whether he had been issued a valid FOID card.

¶ 57    When a minor challenges the sufficiency of the evidence against him, this court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the offense beyond a reasonable doubt. *In re W.C.*, 167 Ill. 2d 307, 336. A reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). We emphasize that the "determination of the weight to be given to witnesses' testimony, their credibility, and the reasonable inferences to be drawn [therefrom] from the evidence" are well within the purview of the trier of fact. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). However, a trier of fact's credibility findings, although given great deference, are "neither conclusive nor binding." *In re O.F.*, 2020 IL App (1st) 190662, ¶ 25 (citing *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007)). Finally, a defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 58    The State has the burden of proving beyond a reasonable doubt each element of an offense alleged in the delinquency petition. *In re Vladimir P.*, 283 Ill. App. 3d 1068, 1076-77 (1996). To prove respondent had committed AUUW under the statutory provision at issue, the State had to show that, at the time of the offense, respondent: (1) carried or possessed a firearm on or about his person, upon any public street, alley, or other public lands within the corporate limits of a city, village, or incorporated town and (2) he had not been issued a current, valid FOID card. 720 ILCS 5/24-1.6(a)(2), (a)(3)(C).

¶ 59    On appeal, respondent solely challenges the State's proof that he had not been issued a valid FOID card. In that regard, our supreme court has held that the AUUW statute does not require the physical carrying of a FOID card, only that a valid FOID card has been issued to the individual possessing the firearm. *People v. Holmes*, 241 Ill. 2d 509, 522 (2011). "[A] police officer's testimony may be sufficient to establish the lack of a FOID card." *In re O.S.*, 2018 IL App (1st) 171765, ¶ 37.

¶ 60    Respondent argues that it is not clear from Pham's testimony whether he meant that D.B. did not have a FOID card on his person or whether he had never been issued one, and he analogizes the circumstances in the instant case to those in *In re Manuel M.*, 2017 IL App (1st) 162381. He also argues that the State did not present any documentary proof that respondent did not have a FOID card. We are not persuaded by respondent's arguments for the following reasons.

¶ 61    In the case before us, when asked, "Did you learn during processing whether he had a FOID card?", Pham responded, "He did not have a FOID card or CCL, correct." In finding respondent guilty, the trial court clearly found Pham's testimony credible and unambiguous. Key to our review is the conduct about which Pham is testifying. The question asked related to Pham's conduct "during processing," as opposed to his conduct on the scene of defendant's arrest. We perceive no

lack of clarity in Pham's testimony. The clear and only inference to be drawn from Pham's testimony is that respondent had not been issued a FOID card. The inference is more than a reasonable one, and we will not second guess the trial court's consideration of Pham's testimony. See *People v. Givens*, 237 Ill. 2d 311, 334 (2010) ("[A] reviewing court must allow all reasonable inferences from the record in favor of the prosecution.").

¶ 62    The State also asserts that respondent's act of fleeing from Pham corroborates Pham's statement that respondent did not have a FOID card. Essentially, the State contends that, if respondent legally possessed the firearm, he would not have run from the police. In response, respondent contends that his flight from Pham does not establish consciousness of guilt and he may have had other motivations to run from police. In particular, he notes that other courts have considered  "societal conditions that may lead defendants of color to flee police[.]" For support, he relies on *People v. Horton*, 2019 IL App (1st) 142019-B, ¶¶ 68-71, in which this court discussed a Massachusetts Supreme Court opinion and a Department of Justice report on Chicago police practices—both of which recognized a pattern of racial profiling in law enforcement—"to highlight that an eminently reasonable and noncriminal reason explains [the defendant's] actions after seeing the police." The court in *Horton* concluded that flight alone is not sufficient to establish reasonable suspicion. *Id.* ¶ 67; but see *People v. Hart*, 214 Ill. 2d 490, 519 (2005) ("[W]e believe [the] defendant's flight and resistance upon apprehension constitute circumstances from which the trier of fact could infer consciousness of guilt."); *People v. Williams*, 266 Ill. App. 3d 752, 760 (1994) ("A trier of fact may infer consciousness of guilt from evidence of a defendant's flight [from] the police.").

¶ 63    Respondent's point is well taken, and thus, we disagree that the act of fleeing, alone, supported the State's evidence that respondent did not have a FOID card. However, we do find

that the act of fleeing in combination with discarding the loaded firearm in a gangway does suggest that respondent did not legally possess the firearm. See *People v. Grant*, 2014 IL App (1st) 100174-B, ¶¶ 31-33 (finding that the defendant's flight from police officers *and* the defendant's statement that he purchased the handgun for $75 from a "crack head" corroborated the State's evidence that the defendant did not have a valid FOID card).

¶ 64    Respondent argues that *In re Manuel M.*, 2017 IL App (1st) 162381, is analogous, and like that panel of this court, we should reverse respondent's delinquency adjudication and sentence for AUUW predicated on not having been issued a FOID card. In *Manuel M.*, law enforcement was monitoring a park due to recent reports of gunfire. *Id.* ¶ 6. A police officer observed, through binoculars, the respondent and two other individuals near the park "flashing gang signs at passing vehicles, causing the vehicles to swerve toward oncoming traffic or parked cars." *Id.* Police officers drove to the park and the respondent was arrested. *Id.* During the pat-down of the respondent, a pistol was recovered from his pants. *Id.* The officer testified at trial that the respondent was unable to present a valid FOID card. *Id.* ¶ 8. On appeal, the State conceded that it had not presented evidence that the respondent had not been issued a FOID card. *Id.* ¶ 15. The appellate court accepted the State's concession. *Id.* We do not find *Manuel M.* analogous. There, the officer testified at trial that the respondent was unable to present a FOID card, not that the respondent did not have a FOID card or had not been issued one. The clear inference from the testimony in *Manuel M.* is that that officer was only referring to whether the respondent had a FOID in his possession at the time of his arrest. That is not the case here. Again, the question posed to Pham sought information during processing, a time during which Pham would have had the opportunity to confirm issuance of a card and would likely have already concluded regarding possession.

¶ 65    Even were we to agree that Pham's testimony regarding respondent's possession of a FOID card was ambiguous, we consider *People v. Grant*, 2014 IL App (1st) 100174-B, to be more appropriately analogous to the facts before us. There, law enforcement responded to a report of gunshots near the defendant's house and arrested him after they observed him attempt to flee with a gun in his hand. *Id.* ¶ 2. At trial, the arresting officer testified that he had asked "the defendant if he had a current valid FOID" and the defendant informed him that he did not. *Id.* ¶ 25. The arresting officer also testified that the defendant did not at any point present a valid FOID card. *Id.* On appeal, the defendant made the same argument as respondent makes here, namely that the officer's testimony shows at most that the defendant did not have a FOID card on his person but it did not show that he had not been issued one. *Id.* ¶ 26. The appellate court found this to be a narrow interpretation of the testimony and stated that "whether the defendant 'had a valid FOID card' can also be reasonably interpreted as asking whether the defendant owned or had been issued a valid FOID card, regardless of whether or not he was carrying it on his person at the time." *Id.* The officers' trial testimony in *Grant* and here are similar, where both testified that the offender did not have a valid FOID card. Neither referenced whether the offender had one in his "possession" or on his "person." Like the court in *Grant*, we also find that respondent's argument on appeal relies on a narrow interpretation of Pham's testimony. We do not find Pham's testimony to be "vague"; rather, we consider it broad and comprehensive, in that it encompasses whether respondent had a valid FOID card *at all*.

¶ 66    Viewing Pham's testimony in the light most favorable to the State, we find that there was sufficient evidence that respondent had not been issued a FOID card and the State proved respondent guilty beyond a reasonable doubt of the offense of AUUW.

¶ 67                              C. The Order of Commitment

¶ 68    Finally, respondent argues that the trial court's order of commitment violates section 5-750(3) of the Juvenile Court Act (705 ILCS 405/5-750(3) (West 2022)). He asserts that the order erroneously states that respondent "is subject to a maximum term of seven years commitment to the custody of the Illinois Department of Juvenile Justice (IDJJ)" but he will be 21 years old in less than seven years and, at that time, can no longer be held in the custody of IDJJ. Thus, he requests that this court direct the trial court to enter an amended order "to correctly reflect a maximum term that does not pass [respondent's] 21st birthday." In the alternative, respondent argues that his counsel was ineffective for failing to object to the commitment order at sentencing.

¶ 69    We need not engage in a protracted analysis of this argument. Contrary to respondent's assertion, the order of commitment clearly states that respondent is to be committed to the IDJJ for "an indeterminate period as provided in 705 ILCS 405/5-750(1) and (3), not to exceed (a) that period for which an adult could be committed for the same act, or (b) the minor's 21st birthday, whichever occurs first." The subsequent sentence states that defendant "may be held in a Department facility without being released for a maximum term of 7 years." The subsequent sentence makes clear that the "period for which an adult could be committed for the same act" was seven years. These sentences are clearly meant to be read together and directly relate to one another. The Juvenile Court Act provides that "the commitment of a delinquent to the Department of Juvenile Justice shall be for an indeterminate term which shall automatically terminate upon the delinquent attaining the age of 21 years[.]" 705 ILCS 405/5-750(3). The order of commitment plainly complies with the statute. The trial court did not err, and there is nothing in the order of commitment that needs correcting. For that same reason, his alternative claim of ineffective assistance of counsel likewise fails.

¶ 70                                III. CONCLUSION

¶ 71    For the reasons stated, we affirm the judgment of the circuit court.

¶ 72    Affirmed.