2024 IL App (1st) 221031

SIXTH DIVISION
August 30, 2024

No. 1-22-1031

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 18 CR 1248 |
| | ) | |
| | ) | |
| ROBERT THOMPSON, | ) | Honorable |
| | ) | Maria Kuriakos-Ciesel, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

**OPINION**

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Justices Hyman and C.A.Walker concurred in the judgment and opinion.

¶ 1    In January 2018, Robert Thompson, then 18 years old, was charged by indictment with,

*inter alia*, eight counts of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6

(West 2018)). Thompson pled guilty on August 16, 2018, to one count alleging that he

knowingly carried a handgun, pistol, or revolver on or about his person, when not on his own

land or in his abode, legal dwelling, or fixed place of business, or on the land or in the legal

dwelling of another person as an invitee with that person's permission, and he had not been

issued a currently valid firearm owner's identification (FOID) card at the time of the offense. *Id.*

§ 24-1.6(a)(1), (a)(3)(C). The trial court sentenced Thompson to two years' probation pursuant to the First Time Weapon Offender Program (730 ILCS 5/5-6-3.6 (West 2018)), which included the conditions that he not violate the criminal statutes of any jurisdiction, complete drug testing, and complete 50 hours of community service.

¶ 2 On December 19, 2018, the State filed a petition for violation of probation (VOP) alleging that Thompson was arrested for resisting arrest. After several continuances, the State filed a second VOP petition on July 25, 2020, after Thompson had been arrested and charged with possession of a stolen motor vehicle (PSMV). Between December 20, 2018, and July 25, 2020, Thompson had completed his community service, graduated from high school, tested negative for drugs, entered counseling, and been accepted to college. The case was continued pending the resolution of the new arrests.

¶ 3 On February 1, 2022, the State informed the court that Thompson had been acquitted of the resisting arrest charge. Defense counsel requested a conference under Illinois Supreme Court Rule 402 (eff. July 1, 2012) to resolve the VOP petitions. After the conference, defense counsel filed a motion asking that Thompson's probation be terminated satisfactorily, noting that, pursuant to section 5-6-2(c-1) of the Unified Code of Corrections (730 ILCS 5/5-6-2(c-1) (West 2020)), Thompson should have received a 90-day credit against the term of his probation because he obtained a high school diploma, which would have resulted in Thompson's probation terminating on May 17, 2020. Counsel further argued that pursuant to *People v. Tolliver*, 2021 IL App (1st) 190129, the trial court could not extend Thompson's probation beyond its expiration date without a hearing and a finding of a violation and, because no such hearing occurred between December 20, 2018, and May 17, 2020, Thompson's probation was wrongly extended

and his second arrest for PSMV in July 2020 could not form the basis of a new violation.

¶ 4    At the hearing on Thompson's motion on June 14, 2022, the State argued that Thompson did not receive the 90-day credit because he did not petition to have his probation shortened upon graduation and the second VOP occurred before the original expiration of the probation period in August 2020. Defense counsel countered that the 90-day credit automatically applied. The trial court denied Thompson's motion, finding that the first VOP tolled the termination date of the probation and the delay that occurred on the resisting arrest charge was due to the COVID-19 pandemic. In addition, the court found that it could find a VOP occurred even if Thompson was acquitted of the resisting charge and, therefore, even though Thompson was ultimately acquitted of that, the VOP based on the resisting charge was still pending and continued to toll the probation period.

¶ 5    Defense counsel filed a motion to reconsider. On June 29, 2022, the trial court was informed that Thompson pled guilty to PSMV and was sentenced to probation. There was a hearing on the second VOP. The State presented a certificate of conviction as proof of Thompson's commission of PSMV. The trial court terminated Thompson's probation unsatisfactorily, and judgment was then entered on Thompson's conviction for AUUW.

¶ 6                                    ANALYSIS

¶ 7    On appeal, Thompson advances a single constitutional claim. Relying on *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), he argues that the AUUW statute (720 ILCS 5/24-1.6(a)(1), (a)(3)(c) (West 2018)), which prohibits the possession of a gun by those 18- to 20-year-olds who have not been issued a FOID card, is facially unconstitutional because it infringes upon "the Second Amendment right to bear arms of individuals whose ability to obtain

3

a FOID card is significantly burdened because of their age." Thompson focuses on the portion of the Firearm Owners Identification Card Act (FOID Card Act) that states in relevant part that an individual 18 to 20 years of age is able to obtain a FOID card when "he or she has the written consent of his or her parent or legal guardian to possess and acquire firearms and firearm ammunition." 430 ILCS 65/4(a)(2)(i) (West 2018). The State responds to Thompson's facial challenge by arguing that Thompson misreads both *Bruen* and the second amendment as conferring an unqualified entitlement to possess and carry firearms without restriction.

¶ 8     Before addressing the merits of Thompson's argument, we must address the State's argument that, because Thompson plead guilty in this case, he has waived all nonjurisdictional defects, even constitutional ones, and his appeal must be dismissed. Once a voluntary plea has been entered, the plea waives all irregularities or errors, including those of a constitutional dimension. *People v. Townsell*, 209 Ill. 2d 543, 545 (2004). However, Thompson cites our decision in *People v. Patterson*, 2018 IL App (1st) 160610, ¶ 18, to support his argument that his guilty plea does not negate his ability to raise a constitutional challenge to the AUUW statute.

¶ 9     In *Patterson*, this court, relying on the United States Supreme Court's decision in *Class v. United States*, 583 U.S. 174 (2018), held that an as-applied constitutional challenge could be raised even after a negotiated guilty plea. See *Patterson*, 2018 IL App (1st) 160610, ¶¶ 19-21. Therein, we held that, where a defendant's constitutional claim does not contradict the terms of his indictment or his plea agreement and does not focus upon case-related constitutional defects that occurred prior to the entry of his guilty plea, the defendant does not waive his constitutional claim by voluntarily pleading guilty. *Id.* ¶ 21. In so holding, we noted that in *Class* the United States Supreme Court looked back at its holdings on the nature of guilty pleas, which

" 'stretche[d] back nearly 150 years,' " and found that they reflected, in broad outline, an understanding that "a guilty plea does not bar a claim on appeal 'where on the face of the record the court had no power to enter the conviction or impose the sentence.' " (Internal quotation marks omitted.) *Id.* ¶ 20 (quoting *Class*, 583 U.S. at 180-81). Hence, in *Patterson* we held that, because the defendant's as-applied vagueness challenge to the armed habitual criminal statute under which he was prosecuted did not contradict the terms of his indictment and plea agreement and did not focus upon any case-related defects that occurred prior to the entry of his guilty plea, but rather focused on the State's power to prosecute his admitted conduct, his voluntary plea did not bar his appeal. *Id.* ¶ 21.

¶ 10    Thompson presents a facial challenge to the AUUW statute, not an as-applied challenge as the defendant in *Patterson* made. Although facial and as-applied constitutional challenges are both intended to address constitutional infirmities, they are not interchangeable. See *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305-06, 318 (2008) (recognizing the "fundamental distinction" between facial and as-applied challenges). An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party. *People v. Garvin*, 219 Ill. 2d 104, 117 (2006). In contrast, a facial challenge requires a showing that the statute is unconstitutional under any set of facts; *i.e.*, the specific facts in the challenging party's case are irrelevant. *Id.* A defendant may raise a facial challenge to the statute under which he has been convicted at any time, even after a guilty plea. See *People v. Jackson*, 199 Ill. 2d 286, 300 (2002); *People v. Thompson*, 2015 IL 118151, ¶ 32. Therefore, we will consider Thompson's constitutional claim on the merits.

¶ 11    The second amendment states: "A well regulated Militia, being necessary to the security

of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. "A statute will be deemed facially unconstitutional only if there is no set of circumstances under which the statute would be valid." *People v. Bochenek*, 2021 IL 125889, ¶ 10. "Statutes are presumed constitutional, and the party challenging the constitutionality of a statute has the burden of clearly establishing its invalidity. A court must construe a statute so as to uphold its constitutionality if reasonably possible." *People v. Gray*, 2017 IL 120958, ¶ 57. We review *de novo* whether a statute is facially unconstitutional. *Bochenek*, 2021 IL 125889, ¶ 9. As the United States Supreme Court recently confirmed, a facial attack on the constitutionality of a statute is the " 'most difficult challenge to mount successfully.' " *United States v. Rahimi*, 602 U.S. ___, ___, 144 S. Ct. 1889, 1898 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

¶ 12    Thompson was convicted of possessing a gun without having been issued a FOID card. Section 24-1.6(a)(1), (a)(3)(C) of the Code, which contains the FOID card requirement, states:

> "(a) A person commits the offense of aggravated unlawful use of a weapon when he or she knowingly:
>
> > (1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, *** any pistol, revolver, stun gun or taser or other firearm; [and]
> >
> > ***
> >
> > (3) One of the following factors is present:
> >
> > * * *

> (C) the person possessing the firearm has not been issued a
> currently valid Firearm Owner's Identification Card[.]" 720 ILCS 5/24-
> 1.6(a)(1), (a)(3)(C) (West 2018).

¶ 13    The FOID Card Act, which establishes requirements for obtaining a FOID card, was enacted in 1968 to "identify[ ] persons who are not qualified to acquire or possess firearms, firearm ammunition, stun guns, and tasers." 430 ILCS 65/1 (West 2018). Section 4 of the FOID Card Act states that an applicant for a FOID card must, among other requirements, "[s]ubmit evidence to the Department of State Police[1] that":

> "He or she is 21 years of age or over, or if he or she is under 21 years of age that he or
> she has the written consent of his or her parent or legal guardian to possess and acquire
> firearms and firearm ammunition and that he or she has never been convicted of a
> misdemeanor other than a traffic offense or adjudged delinquent, provided, however, that
> such parent or legal guardian is not an individual prohibited from having a Firearm
> Owner's Identification Card and files an affidavit with the Department as prescribed by
> the Department stating that he or she is not an individual prohibited from having a
> Card[.]" *Id.* § 4(a)(2)(i).

"[E]very applicant found qualified *** shall be entitled to a [FOID] Card," and all applications shall be approved or denied "within 30 days from the date they are received." *Id.* § 5(a).

¶ 14    Prior to *Bruen*, *District of Columbia v. Heller*, 554 U.S. 570 (2008), dictated our analysis of second amendment issues. In *Heller*, the United States Supreme Court confirmed that the right

---

[1]During the time that Thompson's case has been pending, the Department of State Police has been officially renamed the Illinois State Police, and the FOID Card Act now reflects that name. Pub. Act 102-538 (eff. Aug. 20, 2021) (amending 20 ILCS 5/5-15); Pub. Act 102-237 (eff. Jan. 1, 2022) (amending 430 ILCS 65/4).

to keep and bear arms was subject to long-standing prohibitions on the possession of firearms by felons and the mentally ill, to laws forbidding the carrying of firearms in sensitive places like schools and government buildings, and to laws imposing conditions and qualifications on the commercial sale of firearms. *Id.* at 626-27.

¶ 15    In upholding a law-abiding citizen's right to possess an operable handgun "in defense of hearth and home," the *Heller* Court, using a two-step test that "combine[d] history with means-end scrutiny" (*Bruen*, 597 U.S. at 17), stated that the second amendment's guarantee of an individual right to possess and carry weapons in cases of confrontation, like the first amendment's right of free speech, was not unlimited. *Heller*, 554 U.S. at 592, 595, 635. The *Heller* Court did "not read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation" and found that the right to keep and bear arms was not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (Emphasis omitted.) *Id.* at 595, 626.

¶ 16    Roughly two years later in *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010), the Court extended the second amendment's individual right to keep and bear arms to the states under the fourteenth amendment. In so doing, the Court reiterated its central holding in *Heller* "that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense." *Id.* In addition, the Court reiterated that the second amendment right was far from absolute and noted that the doctrine of incorporation "does not imperil every law regulating firearms." *Id.* at 786.

¶ 17    After *Heller* and *McDonald*, Illinois courts applied a two-part approach when analyzing the constitutionality of a restriction on the second amendment right to bear arms. *Wilson v.*

*County of Cook*, 2012 IL 112026, ¶ 41. Under this approach, the court first conducted a threshold inquiry into whether the restricted activity is protected by the second amendment. This requires a textual and historical analysis to determine whether the challenged law imposed a burden on conduct that was understood to be within the scope of the second amendment's protection at the time of ratification. *Id.* The regulated activity is categorically unprotected if the challenged law applies to conduct falling outside the scope of the second amendment right. *Id.* However, "if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected," then the court, applying the appropriate level of means-ends scrutiny, conducts a second inquiry into the strength of the government's justification for restricting or regulating the exercise of second amendment rights. (Internal quotation marks omitted.) *Id.* ¶ 42; see *People v. Henderson*, 2013 IL App (1st) 113294, ¶ 29; *Ezell v. City of Chicago*, 651 F.3d 684, 701-04 (7th Cir. 2011).

¶ 18     Two years ago, in *Bruen*, 597 U.S. 1, the United States Supreme Court decided a challenge to a New York licensing regime that regulated gun possession and carry. Under New York's licensing requirements, individuals who wanted to possess a firearm at home were required to convince a licensing officer that they were of good moral character and did not have a history of crime or mental disease and that no good cause for denial existed. *Id.* at 11. Conversely, individuals who wanted to carry a firearm outside of their home had to show "proper cause" to be issued a license. (Internal quotation marks omitted.) *Id.* at 12. This proper cause requirement meant that people had to "demonstrate a special need for self-protection distinguishable from that of the general community." (Internal quotation marks omitted.) *Id.*

¶ 19     In analyzing the question before it, the Court announced a new framework for evaluating

the constitutionality of firearm regulations. *Id.* at 17-18. The Court found that the two-step approach used since *Heller* was "one step too many" and condemned the strict scrutiny analysis in the second amendment context, opting instead to limit the analysis to "plain text" and history. *Id.* at 18-19, 24-25. Under *Bruen*'s new framework, courts first need to determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If it does, then the Constitution "presumptively protects that conduct," and the government "must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." (Internal quotation marks omitted.). *Id.* at 24. Applying this new standard to New York's "proper cause" law, the Court first found that, under the plain text of the second amendment, the individual right to bear arms extended outside of the home and, therefore, the regulated activity was presumptively permitted. *Id.* at 33. The Court then looked to whether the government could prove that the regulation aligned with our nation's history of firearm regulation at the time the second amendment was enacted. *Id.* at 34-36. Finding that the New York law could not be squared with history in that the government failed to establish "a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" and failed to identify "any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense," the Court concluded that the law violated the second and fourteenth amendments. *Id.* at 38-39; see *McDonald*, 561 U.S. at 791 (extending second amendment rights to the states through the fourteenth amendment).

¶ 20    In so holding, the Court specifically differentiated between may-issue licensing regimes, where "authorities have discretion to deny concealed-carry licenses even when the applicant

satisfies the statutory criteria," and shall-issue licensing regimes, where "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen*, 597 U.S. at 13-14. The Court held the New York licensing regime in question was an unconstitutional may-issue regime, but it cautioned its holding should not be misconstrued as finding existing shall-issue regimes, including Illinois's, unconstitutional:

> "To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].' [Citation.] Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry. [Citation.] Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' [Citation.]" *Id.* at 38 n.9.

¶ 21 Recently, in *Rahimi*, 602 U.S. ___, 144 S. Ct. 1889, the Court provided some clarity on the *Bruen* test. Rahimi was indicted for possessing a firearm while subject to a domestic violence restraining order in violation of 18 U.S.C. § 922(g)(8) (2018). He argued that section 922(g)(8) violated on its face the second amendment right to keep and bear arms. Applying *Bruen*, the Court rejected Rahimi's facial challenge to section 922(g)(8), finding that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed

consistent with the Second Amendment." *Rahimi*, 602 U.S. at \_\_\_, 144 S. Ct. at 1903. The court further found that section 922(g)(8) did not broadly restrict arms use by the general public, unlike the regulation in *Bruen*, and only restricted firearm possession for a limited duration. *Id.* at \_\_\_, 144 S. Ct. at 1901.

¶ 22    The *Rahimi* Court clarified the test it set out in *Bruen*. The Court explained that, even if a law regulates the possession of firearms for a permissible reason, the law may nevertheless violate the second amendment if it regulates arms bearing "to an extent beyond what was done at the founding." *Id.* at \_\_\_, 144 S. Ct. at 1898. At the same time, the court explained that a challenged regulation need not be a " 'historical twin' " to its precursors but must only be considered " 'analogous enough to pass constitutional muster.' " *Id.* at \_\_\_, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30). The law need not be a " 'dead ringer.' " *Id.* at \_\_\_, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30). Stated differently, the Court's recent second amendment precedents "were not meant to suggest a law trapped in amber." *Id.* at \_\_\_, 144 S. Ct. at 1897-98 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791.").

¶ 23    We need not go through the exercise of applying the test announced in *Bruen* and clarified in *Rahimi* here because Illinois's FOID Card Act establishes an objective shall-issue licensing regime, which *Bruen* recognized was not unconstitutional. See *Bruen*, 597 U.S. at 38 n.9). The *Bruen* Court explicitly stated, "Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so." *Id.* at 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.).

¶ 24 In Illinois, individuals between the ages of 18-20 are not categorically banned from obtaining a FOID card. Rather, the Illinois State Police shall issue a FOID card when an individual who is 18 to 20 years of age establishes

> "that he or she has the written consent of his or her parent or legal guardian to possess and acquire firearms and firearm ammunition and that he or she has never been convicted of a misdemeanor other than a traffic offense or adjudged delinquent, provided, however, that such parent or legal guardian is not an individual prohibited from having a Firearm Owner's Identification Card and files an affidavit with the Department as prescribed by the Department stating that he or she is not an individual prohibited from having a Card[.]" 430 ILCS 65/4(a)(2)(i) (West 2018).

¶ 25 In *People v. Gunn*, 2023 IL App (1st) 221032, ¶¶ 7, 17, the defendant sought reversal of his AUUW conviction premised on lack of a FOID Card, arguing that his conviction could not stand under *Bruen*. We rejected Gunn's challenge based on *Bruen*'s distinction between "shall-issue" and "may-issue" licensing regimes. *Id.* ¶ 19 (citing *Bruen*, 597 U.S. at 38 n.9). We stated, "[t]here is no need for us to engage in a historical analysis of firearm regulation when the Supreme Court has already done so and explicitly sanctioned the use of background checks." *Id.* As we recognized in *Gunn*, *Bruen* unequivocally left intact a state's ability to impose licensing regimes for the possession and public carry of firearms and to criminalize such acts when done without a license.

¶ 26 The requirement placed on 18- to 20-year-olds to obtain parental consent under the FOID Card Act is similar to requirements that an applicant complete a firearm safety course and pass a background check, which *Bruen* found were permissible restrictions. See *Bruen*, 597 U.S. at 38

n.9; *Gunn*, 2023 IL App (1st) 221032, ¶ 19. Like a firearm safety course and background check, parental consent serves to help ensure that FOID card applicants in that emerging adult age group are mature and responsible enough to possess and use a firearm. See *Horsley v. Trame*, 808 F.3d 1126, 1134 (7th Cir. 2015) ("The parent or guardian signature provision provides for an individualized assessment of the applicant's fitness for possession of a firearm by a person likely to be in the best position to make such an evaluation."). Unlike the may-issue licensing statute at issue in *Bruen*, here the Illinois State Police are not empowered to deny a FOID card on a discretionary "perceived lack of need or suitability." *Bruen*, 597 U.S. at 13.

¶ 27    Moreover, the "absence of a parent or guardian signature is not a 'veto' on the ability of a person between 18 and 21 to get a FOID card in Illinois." *Horsley*, 808 F.3d at 1132. Rather, an 18- to 20-year-old who does not have parental consent may petition the Firearm Owner's Identification Card Review Board or the circuit court for relief, and upon a sufficient showing regarding the applicant's criminal record, lack of dangerousness, and the public interest, he may be granted a FOID card.[2] 430 ILCS 65/10(c) (West 2022). And administrative decisions of the Firearm Owner's Identification Card Review Board are subject to judicial review. *Id.* § 11(a).

¶ 28    Accordingly, *Bruen*'s validation of the Illinois FOID Card Act's objective, shall-issue licensing regime is, standing alone, a sufficient basis on which to reject Thompson's facial challenge to the AUUW statute. See *Gunn*, 2023 IL App (1st) 221032, ¶ 19 (*Bruen*'s holding is inapplicable to Illinois's FOID Card Act because Illinois is a shall-issue state); *People v.*

---

[2]At the time of Thompson's indictment, he would have had to petition the Director of State Police or the circuit court for relief from the parental consent requirement. The subsequent creation of the Firearm Owner's Identification Card Review Board (see Pub. Act 102-237 (eff. Jan. 1, 2022) (amending 430 ILCS 65/10)) does not affect our analysis on this issue.

*Thompson*, 2023 IL App (1st) 220429-U, ¶¶ 51-60) (rejecting argument that the AUUW statute is facially unconstitutional under the second amendment, without engaging in a fulsome second amendment analysis, after finding that *Bruen* explicitly held that Illinois's concealed carry licensing statute comports with the second and fourteenth Amendments); *People v. Burns*, 2024 IL App (4th) 230428, ¶ 41 (Illinois's licensing regime has a shall-issue framework that was endorsed by *Bruen*); *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 61 (Illinois is a shall-issue state and therefore Illinois's FOID Card Act and Firearm Concealed Carry Act are not facially unconstitutional under *Bruen*), *pet. for leave to appeal pending*, No. 130708 (filed May 22, 2024). Accordingly, we reject Thompson's facial challenge to the AUUW statute as it relates to the constitutionality of the parental consent requirement of the FOID Card Act for those between the ages of 18 and 20. Contrary to Thompson's argument, *Bruen*'s distinguishing language is not mere *dicta*. Rather, the *Bruen* Court was clear and precise in its reasoning to specifically exclude objective, shall-issue statutory licensing regimes from its decision.

¶ 29    Even if *Bruen*'s distinguishing language is *dicta*, the parental consent requirement imposed on 18- to 20-year-olds to obtain a FOID card does not violate the second amendment under the *Bruen* framework. For review, under *Bruen*'s new framework, courts determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, the Constitution "presumptively protects that conduct," and the government "must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* In its most recent second amendment decision, the United States Supreme Court's analysis was limited to the second *Bruen* step, presumably because the parties did not dispute Rahimi was covered by the plain text of the second amendment. See

*Rahimi*, 602 U.S. \_\_\_, 144 S. Ct. 1889.

¶ 30　Thompson argues that under the first part of the *Bruen* framework, the plain text of the second amendment covers his possession of a firearm. He contends that, when a constitutional challenge is rooted in an individual's status, such as an 18- to 20-year-old individual, the question we must answer is whether the individual qualifies as among the "people" who may enjoy "the right of the people to keep and bear Arms." U.S. Const., amend. II; see, *e.g.*, *Worth v. Jacobson*, 108 F.4th 677, 689 (8th Cir. 2024) ("[o]rdinary, law-abiding, adult citizens that are 18 to 20-year-olds are members of the people" for second amendment purposes). Thompson also argues that, under the second part of the *Bruen* framework, the State cannot show that the regulation is consistent with the nation's history and tradition of firearm regulation.

¶ 31　We assume, as we did in *People v. Lewis*, 2024 IL App (1st) 230568-U, ¶ 23, and *In re D.B.*, 2023 IL App (1st) 231146-U, ¶¶ 23, 33, that the possession of a firearm outside the home by persons 18 to 20 years old is covered by the second amendment's plain text for the sole purpose of reaching Thompson's second argument under *Bruen*. See *Bruen*, 597 U.S. at 31-32 (protections of the second amendment extend to "ordinary, law-abiding, adult citizens"); *Worth*, 108 F.4th at 689. We begin our analysis of Thompson's argument that the State cannot show that an age-based parental consent regulation is consistent with the nation's history and tradition of firearm regulation with a review of Illinois Supreme Court cases addressing age-based restrictions under the second amendment.

¶ 32　Our supreme court has repeatedly rejected challenges to statutes that prohibit firearm possession based on age. In *People v. Aguilar*, 2013 IL 112116, ¶¶ 25-26, the defendant argued that the section in the unlawful possession of a firearm statute that barred persons under the age

of 18 from possessing any firearm which may be concealed upon the person violated the second amendment because, "at the time the second amendment was drafted and ratified, the right to keep and bear arms extended to persons 16 and 17 years of age." Our supreme court rejected the defendant's argument, reasoning that after *Heller* several courts undertook a historical examination of laws prohibiting the possession of firearms by minors and concluded that "the possession of handguns by minors is conduct that falls outside the scope of the second amendment's protection." *Id.* ¶¶ 26-27. The *Aguilar* court expounded: "these cases explain that, although many colonies permitted or even required minors to own and possess firearms for purposes of militia service, nothing like a right for minors to own and possess firearms has existed at any time in this nation's history," and "laws banning the juvenile possession of firearms have been commonplace for almost 150 years and both reflect and comport with a 'longstanding practice of prohibiting certain classes of individuals from possessing firearms— those whose possession poses a particular danger to the public.' " (Emphases omitted.) *Id.* ¶ 27 (quoting *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009)). The court found no need to repeat the historical evidence set forth in these decisions and found it only necessary to "express our agreement with the obvious and undeniable conclusion that the possession of handguns by minors is conduct that falls outside the scope of the second amendment's protection." *Id.*

¶ 33 Two years later, our supreme court found sufficient historical precedent to allow meaningful firearm regulation for 18- to 20-year-olds. In *People v. Mosley*, 2015 IL 115872, ¶ 33, the defendant argued that his AUUW convictions under the "FOID card" subsections, (a)(1), (a)(3)(C), the same subsections Thompson challenges here, "unconstitutionally disarm[ed] young adults who are 18 to 20 years old in violation of the second amendment." Our supreme

court found "the FOID card requirement of subsection (a)(3)(C) is consistent with [the Illinois Supreme Court's] recognition that the second amendment right to possess firearms is still subject to meaningful regulation." (Internal quotation marks omitted.) *Id.* ¶ 36. Accordingly, the court found that subsections (a)(1), (a)(3)(C) of the AUUW statute did not violate the second amendment.

¶ 34    Shortly thereafter, in *In re Jordan G.*, 2015 IL 116834, ¶¶ 21, 25, our supreme court also rejected the argument that subsection (a)(1), (a)(3)(I) of the AUUW statute, the subsection of the statute prohibiting persons under the age of 21 from possessing handguns who are not engaged in lawful hunting activities, violated the second amendment. Referencing its conclusion in *Aguilar* that "age based restrictions on the right to keep and bears arms are historically rooted," our supreme court explained that those restrictions also applied "to those persons under 21 years of age." *Id.* ¶ 25. The court further stated that it had previously "cited with approval several cases finding it evident from a review of the relevant historical record that age based regulations on minors' access to firearms for the purpose of ensuring public safety were commonplace and persisted well beyond the Founding Era." *Id.* ¶ 24 (citing *Aguilar*, 2013 IL 112116, ¶ 27).

¶ 35    Although these Illinois Supreme Court decisions were issued before *Bruen* and do not follow the exact *Bruen* framework, this court has nevertheless concluded that the reasoning in these cases "is consistent with the 'plain text' and historical analysis that *Bruen* requires." *Hatcher*, 2024 IL App (1st) 220455, ¶ 58 (finding that in *In re Jordan G.*, 2015 IL 116834, and *Mosley*, 2015 IL 115872, ¶ 38, our supreme court held that there is sufficient historical precedent to establish that those under 21 years of age are outside the scope of the second amendment); *Lewis*, 2024 IL App (1st) 230568-U, ¶ 23 ("although our supreme court's decisions were issued

before *Bruen*, the court in these cases did not apply the means-end scrutiny that *Bruen* rejected," and their reasoning is consistent with the *Bruen* framework); *In re C.P.*, 2023 IL App (1st) 231033-U, ¶¶ 9, 16 (the laws challenged, including a subsection of the AUUW statute, "have never been justified by application of the means-end scrutiny that *Bruen* eliminated," and recognizing that our supreme court has held that the challenged subsections were "firmly justified by text and historical tradition"); *In re D.B.*, 2023 IL App (1st) 231146-U, ¶¶ 31, 34 (finding that, even if "a minor's right to keep and bear arms is covered by the second amendment's plain text, our supreme court has already answered the second step" of the *Bruen* framework, noting that the court "explicitly addressed the historical roots of age-based restrictions on the right to keep and bear arms" and "determined that age-based restrictions are historically rooted in this nation's traditions").

¶ 36       We return to our historic tradition. The requirement of parental consent for a FOID card for 18- to 20-year-olds is consistent with our historic tradition of parental control over their minor children. See Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. Inter Alia 1 (2021). Those between the ages of 18 and 20 were considered "minors" or "infants" in the eyes of the law from the time of the nation's founding through the latter half of the twentieth century. *Id.* at 2. Individuals under the age of majority, 21, were entirely subsumed under the authority of their parents, usually the father, or legal guardian. *Id.* at 8. It was well understood that minors or infants had few legal rights without parental approval. See *id.* at 10-11 (citing 1 Zephaniah Swift, A System of the Laws of the State of Connecticut 213 (John Byrne ed., 1795) ("Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common

speech, minors."); 2 James Kent, Commentaries on American Law 191 (O. Halsted ed., 1827) ("The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years."); 1 John Bouvier, Institutes of American Law 148 (Robert E. Peterson ed., 1851) ("The rule that a man attains his majority at the age twenty-one years accomplished, is perhaps universal in the United States. At this period every man is in the full enjoyment of his civil and political rights ***.")).

¶ 37    Thus, many "militia statutes recognized that minors were not responsible for procuring their own arms, so the statutes required parents or guardians to provide firearms to militia members under the age of twenty-one who were in their care." *Id.* at 15; see 1776 N.H. Laws Sess. 4, ch. 3, § 6, reprinted in 4 Albert Stillman Batchellor, Laws of New Hampshire 39, 40 (Musgrove Printing House 1916) ("An Act for forming and regulating the Militia within the State of New Hampshire in New England," providing that "each and every Officer and private Soldier of said Militia, not under the controul of Parents, Masters, or Guardians, And being of sufficient Ability therefor, in the judgment of the Selectmen of the Town wherein he has his usual place of Abode, shall equip himself, and be constantly provided with a good Fire Arm"); 3 Del. Laws § 7 (1785) ("An Act for establishing a Militia," providing that "every apprentice, or other person of the age of eighteen and under twenty-one years, who hath an estate of the value of eighty pounds, or whose parent shall pay six pounds annually towards the public taxes, shall by his parent or guardian respectively be provided with a musket or firelock"); 1792 N.H. Laws Sess. 2, ch. 33, reprinted in 6 Albert Stillman Batchellor, Laws of New Hampshire 84, 89 (Evans Printing Co. 1904) ("An Act for forming and regulating the Militia within this State, and for repealing all

the laws heretofore made for that purpose," providing "that such of the infantry as are under the care of parents, Masters or Guardians, shall be furnished by them with such Arms and Accoutrements"); 1793 Mass. Acts ch. 14, reprinted in Laws of the Commonwealth of Massachusetts 380, 390 (Wright & Potter Printing Co. 1895) ("An act for regulating and governing the militia of the Commonwealth of Massachusetts," providing that "all Parents, Masters and Guardians shall furnish those of the said Militia who shall be under their care and command, with the Arms and Equipments aforementioned"); 1797 Vt. Acts & Resolves 122 ch. LXXXI, § 15 ("An Act, for Regulating and Governing the militia of This State," providing that "all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipments above mentioned"); 1806 N.C. Sess. Laws 45 (ch. XVIII, § III) ("An Act to revise the Militia Laws of this State, relative to the Infantry," providing that "all parents, masters or guardians shall furnish those of the militia who shall be under their care or command with their arms and equipments above mentioned"); 1810 Mass. Acts 151 (ch. CVII, § 28) ("An Act for regulating, governing, and training the Militia of this Commonwealth," providing that "all parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively with the arms and equipments, required by this act"); 1820 N.H. Laws Sess. 2, ch. 33, § 46, reprinted in 8 Albert Stillman Batchellor, Laws of New Hampshire 953, 980 (Evans Printing Co. 1920) ("An Act for forming, arranging and regulating the Militia," providing that "all parents, masters and guardians shall furnish all minors enrolled in the militia, who shall be under their care respectively with the arms and equipments required by this act"); 1821 Me. Laws 716 (ch. CLXIV, § 34) ("An Act to organize, govern and discipline the Militia of this State," providing that "all parents, masters or

guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms, and equipments, required by this Act"); 1825 Mo. Laws 533 (ch. I, § 24) ("An act to organize, govern and discipline the Militia," providing that "all parents, masters and guardians, shall furnish all minors, enrolled in the militia, who shall be under their care, respectively, with the arms and equipments required by this act").

¶ 38     Moreover, the nation's earliest colleges and universities, such as Yale College, the University of Georgia, the University of North Carolina, and the University of Virginia, forbade their students from possessing guns. Cornell, *supra*, at 13-14. In short, at the founding, "access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them: fathers, guardians, constables, justices of the peace, or militia officers." *Id.* at 14. If a minor wished to get out from under the control of a parent, he could find no relief in the courts because a minor in the founding era had no legal standing to assert a claim to vindicate his rights, including second amendment-type claims. *Id.* at 7. Therefore, today's requirement that an 18- to 20-year-old obtain parental consent for a FOID card aligns closely with our historic tradition that an 18- to 20-year-old obtain parental approval in almost every aspect of life.

¶ 39     Thompson's reliance on *Worth*, 108 F.4th 677, is unavailing. In *Worth*, a group of 18- to 20-year-olds advanced a facial challenge to Minnesota's Personal Protection Act of 2003 (Minn. Stat. Ann. § 624.714(2)(b)(2) (West 2022)) that criminalizes carrying handguns in a public place without a license. In order to obtain a license, Minnesota law requires the applicant to be at least 21 years old. *Worth*, 108 F.4th at 683. The plaintiffs argued the law was unconstitutional under the second and fourteenth amendments. *Id.* Applying the *Bruen* test, the Eighth Circuit Court of

Appeals found the statute unconstitutional. The court first found that 18- to 20-year-olds are part of the people with a right to keep and bear arms under the second amendment and, therefore, that conduct is presumptively protected. *Id.* at 689. After analyzing the nation's historical tradition of firearm regulation, the court then went on to find that the government had not met its burden to "proffer sufficient evidence to rebut the presumption that 18 to 20-year-olds seeking to carry handguns in public for self-defense are protected by the right to keep and bear arms." *Id.* at 698.

¶ 40        *Worth* is distinguishable from the instant case in that it involved Minnesota's categorical ban on those under the age of 21 from carrying handguns in public. There is no such categorical ban here. Rather, Thompson is subject to an age-based parental consent restriction. As we discussed, 18- to 20- years olds did not enjoy unfettered second amendment protections at the nation's founding because they were entirely subjected to the authority and control of their parents or guardians.

¶ 41        We find that, because 18- to 20-year-olds were entirely subsumed under the control and authority of their parents at the founding, an age-based parental consent restriction on a minor's access to firearms, such as the FOID Card Act's requirement that they obtain their parent's consent to obtain a FOID card, cannot be said to violate the second amendment under *Bruen*. Accordingly, we reject Thompson's facial challenge to the AUUW statute.

¶ 42                                CONCLUSION

¶ 43        We conclude that Thompson's facial challenge to section 24-1.6(a)(1), (a)(3)(c), of the AUUW statute fails. First, *Bruen* expressly approved objective, shall-issue firearms licensing regimes such as the one here. Thus, we need not engage in a fulsome second amendment analysis. Second, even applying the second amendment analysis outlined in *Bruen*, our supreme

court has repeatedly rejected second amendment challenges to statutes that prohibit firearm possession based on age. Further, historical precedents align with our present age-based parental consent requirements for minors, who at the founding were considered to be those under the age of 21. After all, parents know their children the best—a truism that has remained unchanged since the nation's founding—and are most suited to judge whether they are responsible and mature enough to possess and use a firearm. See *Horsley*, 808 F.3d at 1134 ("The parent or guardian signature provision provides for an individualized assessment of the applicant's fitness for possession of a firearm by a person likely to be in the best position to make such an evaluation."). Therefore, we reject Thompson's second amendment challenge to the AUUW statute. The judgment of the circuit court is affirmed.

¶ 44    Affirmed.

***People v. Thompson*, 2024 IL App (1st) 221031**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-1248; the Hon. Maria Kuriakos-Ciesel, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Manuela Hernandez, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Jessica R. Ball, and Whitney Bond, Assistant State's Attorneys, of counsel), for the People. |